BANK ONE, TEXAS, N.A.
and NationsBank of
Texas, N.A.

v.

Martha LITTLE d/b/a Mitco, Ltd.

No. 2–97–184–CV.

Court of Appeals of Texas,
Fort Worth.

Aug. 28, 1998.

Friedman, Young & Suder, and Walker C. Friedman, Fort Worth, Texas, Baker & Botts, L.L.P., George C. Lamb, III, Dallas, Texas, for appellant.

Brown, Herman, Scott, Dean & Miles, Stephen L. Tatum, Fort Worth, Texas, for appellee.

Before CAYCE, C.J., and LIVINGSTON and RICHARDS, JJ.

## OPINION

### I. INTRODUCTION

Appellants Bank One, Texas, N.A. (Team Bank) and NationsBank of Texas, N.A. (NCNB) appeal from a jury verdict in favor of Martha Little d/b/a Mitco, Ltd. (Mitco) in Mitco's negligence suit.[1] Although appellants appeal under one cause number, they each raise separate issues, which we will address individually. Team Bank argues: (1) Mitco failed to prove duty, proximate cause, and damages; (2) the trial court submitted an erroneous proximate cause issue to the jury; (3) the trial court committed an evidentiary error concerning the admissibility of Mitco's belief of a deadline by which the letter of credit had to be in Germany; (4) Mitco failed to prove Bank One was a successor in liability to Team Bank; and (5) the amount of prejudgment interest was calculated incorrectly. NCNB argues: (1) Mitco failed to prove duty, the appropriate standard of care, proximate cause, and damages; (2) the amount of prejudgment interest was calculated incorrectly; (3) it is entitled to a new trial if Team Bank wins its appeal; and (4) the jury's Deceptive Trade Practices Act (DTPA) findings will not support an alternate judgment against it. We reverse the trial court's judgment and render a take-nothing judgment in favor of Team Bank and NCNB.

### II. FACTUAL BACKGROUND

Michael Miteff founded Mitco. In 1987, Mitco began importing ostrich skins through a German company named ITC. Mitco sold the skins to boot companies for a profit. Little bought Mitco from Miteff in 1990. However, Miteff remained active in the company and received a twenty-five percent commission on business he brought in. In May 1990, Mitco contracted with ITC to buy 1,500 skins per year over a five-year period.

In July 1991, Justin Boots contracted with Mitco to buy 2,000 skins, in four installments, for a total price of $1,320,000. In this regard, Miteff, ITC, and Justin Boots engaged in negotiations to set up a transferable standby letter of credit with Mitco as beneficiary. Mitco would in turn, transfer the letter of credit to ITC's bank in Germany.[2] In Au-

1. For purposes of this opinion, we will refer to Bank One as Team Bank and NationsBank as NCNB because Team Bank and NCNB were the actual participants in the letter of credit transaction. Bank One and NationsBank subsequently

bought out Team Bank and NCNB, respectively, and are therefore the named parties in this case.

2. The record is scant on the particulars of these negotiations.

gust 1991, Justin Boots applied for the standby letter of credit from NCNB in the amount of $330,000 (25% of the total price or the price of the first installment). The letter of credit was to state that it could only be transferred by NCNB and only upon presentment of the original letter.

On August 19, 1991, NCNB issued the standby letter of credit and named Team Bank as the advising bank. Thus, the letter of credit was sent to Team Bank. On August 20, 1991, Team Bank called Little and told her that the letter of credit had been issued. Little requested a copy of the letter of credit, so Team Bank faxed a copy to Mitco. By accident, a summer intern at Team Bank also placed the original letter of credit in the mail.

After reviewing the faxed copy, Miteff and Little realized the letter of credit was not transferable. Little called Team Bank and told an employee that the letter of credit needed to be transferable. Team Bank's employee told Little that NCNB would have to amend the letter of credit. Little also learned the original had supposedly been mailed to Mitco. The next day, on August 21, Miteff called NCNB, and NCNB prepared an amended letter of credit that Mitco received on Friday, August 23. However, NCNB told Miteff it needed the original letter of credit in order to complete the letter of credit and send it to ITC's bank in Germany.

When the original letter of credit did not arrive in the mail on Monday, August 26, Little called Team Bank and was put in touch with Daisy Seltzer, a trade finance officer in Team Bank's international section. Little drove to Team Bank's office in downtown Fort Worth around noon.[3] Seltzer, upon learning the original may have been mailed to the wrong party, contacted an employee at NCNB,[4] who agreed to send the amended letter of credit to Germany if Little came to NCNB with a letter stating that the original had been lost in the mail. Little contends she told Seltzer that she believed the letter of credit needed to be in Germany at 10:00 a.m. (Central Time) on August 28th.

Little left Team Bank around 3:30 p.m. on the 26th and returned to Mitco's office in Fort Worth where she wrote out the letter explaining the loss of the original letter of credit. On August 27th, Miteff and Little drove to NCNB's office in downtown Dallas[5], saw Sharon Shead, and gave her the letter and the other materials necessary to complete the transfer to Germany. Miteff and Little contend they told Shead of the alleged 10:00 a.m. August 28th deadline and that Shead said the transfer would be done that day (August 27th) and that it would not be a problem. However, both Miteff and Little admitted at trial that Shead never promised to transfer the letter of credit by the deadline and that she merely stated she would do her best. Shead testified it was neither her nor NCNB's practice to make any promises concerning the transmission of letters of credit. Neither the letter of credit nor any other documentation admitted at trial reflected the alleged deadline.

Shead did not send the letter of credit to NCNB's Wire Transfer Department until 1:18 p.m. on Wednesday, August 28. The Wire Transfer Department received notice that the letter of credit was received in Germany at 3:32 p.m. Thus, although valid, binding, and otherwise correct, the letter of credit arrived in Germany five hours after the alleged deadline. (It arrived at 3:32 p.m. Central Time when it was allegedly due at 10:00 a.m. Central Time.)

3. The parties disagree whether Miteff accompanied Little to Team Bank. Miteff testified he was present in Seltzer's office when she called NCNB; Seltzer testified he was not.

4. The parties disagree as to whom Seltzer spoke with at NCNB. Little contends Seltzer talked to Sharon Shead; Seltzer says she talked to Ginger

Downs. Shead stated she did not talk to Seltzer on the 26th.

5. The parties disagree as to what time Little arrived at NCNB. Little contends she got there at 9:15 a.m.; NCNB and Sharon Shead contend Little handed Shead the materials at noon because that was when they were date stamped.

The ostrich skin deal apparently fell through, and Little sued Team Bank and NCNB for breach of contract and negligence. The trial court granted summary judgment in favor of Team Bank and NCNB on the breach of contract claim after Little acknowledged in her deposition that NCNB never made a promise or entered into an agreement to transfer the letter of credit by a specific deadline. Before trial, Mitco amended its petition to add an allegation that NCNB knew that the letter of credit had to be transferred by the deadline and represented that the letter of credit would be timely sent so as to constitute a false, misleading, or deceptive act or practice under the DTPA.

The case went to trial on the negligence and DTPA issues. The jury found: (1) ITC placed a deadline of 5:00 p.m. (German Time), August 28, 1991, for the letter of credit to be in Germany; (2) Mitco, Team Bank, and NCNB were all contributorily negligent for the missed deadline [6]; (3) Mitco suffered lost profit damages of $202,500; and (4) NCNB violated the DTPA causing damages of $60,750. The trial court entered judgment on the jury's negligence findings and awarded Mitco damages and prejudgment interest in the amount of $302,772.32.

### III. DISCUSSION

#### A. Team Bank—Common-law Duty of an Advising Bank

In its first point, Team Bank argues it owed Mitco no common-law duty to refrain from its alleged negligent acts. Team Bank bases its contention on the nature of its limited role as an advising bank and the sparse statutory duties ascribed to that particular role by the Uniform Commercial Code (UCC) and the Uniform Customs and Practice for Documentary Credits (UCP). Also, Team Bank asserts: (1) as a matter of public policy, it would be unwise to recognize a common-law duty that differs from or adds to the duties contained in the UCC; (2) any duty owed by Team Bank, as an advising bank, flowed to NCNB, as the issuing bank,

not Mitco, as the beneficiary; and (3) the foreseeability of the injury is not enough to warrant imposition of a common-law duty.

Mitco, on the other hand, asserts that the lack of an express UCC or UCP duty is immaterial because Team Bank voluntarily undertook to perform four affirmative acts that created a common-law duty to exercise reasonable care in performing those acts: (1) Team Bank mailed the letter of credit contrary to Little's alleged request to have it hold the letter of credit for her to pick up; (2) Team Bank sent the letter to an unknown destination; (3) Team Bank advised Little to wait and see if the letter of credit arrived in the mail over the weekend; and (4) Team Bank advised Little on the afternoon of Monday, August 26, that she could wait until the next morning to go to NCNB.

Thus, we must determine whether Team Bank had a common-law duty to refrain from mishandling the original letter of credit and otherwise allegedly caused Mitco's damages. In order to establish tort liability, a plaintiff must initially prove the existence and breach of a duty owed to the plaintiff by the defendant. *See Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983). A legal duty is a legally recognized obligation to comply with a certain standard of conduct. *See Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). Whether a duty exists under a particular set of facts is a question of law for the court. *See id.*

Factors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing that burden on the party. *See Otis Eng'g Corp.*, 668 S.W.2d at 309. In some instances, an entity that voluntarily enters an affirmative course of action affecting the interests of another is regarded as assuming a duty to act and must do so with reasonable care. *See id.; First Interstate Bank of Texas v. S.B.F.I., Inc.,*

---

6. The jury found Mitco ten percent liable, Team Bank sixty percent liable, and NCNB thirty percent liable for Mitco's damages.

830 S.W.2d 239, 243 (Tex.App.–Dallas 1992, no writ). However, common-law claims may only exist to the extent they do not conflict with UCC provisions. *See Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761, 764 (Tex.1982); *Signal Oil & Gas Co. v. Universal Oil Prods.*, 572 S.W.2d 320, 330 (Tex.1978); *Miller–Rogaska, Inc. v. Bank One, Texas, N.A*, 931 S.W.2d 655, 662 (Tex.App.–Dallas 1996, no writ). Still, not all common-law claims are displaced by the Texas UCC: "[u]nless displaced by the particular provisions of this title, the principles of law and equity ... shall supplement its provisions." *See* TEX. BUS. & COM.CODE ANN. § 1.103 (Vernon 1994); *Miller–Rogaska, Inc.*, 931 S.W.2d at 662.

Letters of credit are governed by the UCC. *See* TEX.BUS. & COM.CODE ANN. § 5.102 (Vernon 1994). Section 5.103 of the Texas Business and Commerce Code defines a "letter of credit" as "an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter (Section 5.102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit." TEX.BUS. & COM. CODE ANN. § 5.103(a)(1) (Vernon 1994). Section 5.103 also defines the roles of the various parties to a letter of credit transaction:

(3) An "issuer" is a bank or other person issuing a credit.

(4) A "beneficiary" of a credit is a person who is entitled under its terms to draw or demand payment.

(5) An "advising bank" is a bank which gives notification of the issuance of a credit by another bank.

(7) A "customer" is a buyer or other person who causes an issuer to issue a credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer. TEX.BUS. & COM.CODE ANN. § 5.103(a)(3)–(5), (7) (Vernon 1994).

Here, NCNB is the issuer, Mitco is the beneficiary, Team Bank is the advising or assigning bank, and Justin is the customer.[7] Justin hired NCNB to create a standby letter of credit[8] that would ensure that Mitco (and ITC) would be paid for the ostrich skins after the skins were sent to Justin. In its role as the issuing bank, NCNB hired Team Bank as the advising bank. NCNB sent Team Bank the finalized original standby letter of credit so that Team Bank could review the letter of credit and notify Mitco of the issuance and terms of the letter of credit by NCNB. *See* TEX.BUS. & COM.CODE ANN. § 5.103(a)(5) (Vernon 1994). In taking on the role as advising bank, Team Bank assumed a duty to accurately inform Mitco of the contents of the letter of credit:

Unless otherwise specified an advising bank by advising a credit issued by another bank does not assume any obligation to honor drafts drawn or demands for payment made under the credit but it does assume obligation for the accuracy of its own statement.

TEX.BUS. & COM.CODE ANN. § 5.107 (Vernon 1994). *See* TEX.BUS. & COM.CODE ANN. § 5.103(a)(5) (Vernon 1994); TEX.BUS. & COM. CODE ANN. § 5.107 cmt. 1 (Vernon 1994) ("[s]ubsection, (1) of this section states its obligations to transmit accurately but not to honor drafts. The advice may of course not

---

7. Three relationships are formed in a typical letter of credit transaction: (1) an underlying contract for the sale of goods between a buyer (Justin) and a seller (Mitco/ITC); (2) an agreement between a bank (NCNB) and its customer (Justin) for the issuance of a letter of credit; (3) the bank's (NCNB) resulting obligation (letter of credit) to pay the beneficiary (Mitco/ITC) upon receipt of the proper documents representing the goods. *See Merchants Bank of New York v. Credit Suisse Bank*, 585 F.Supp. 304, 308 (S.D.N.Y. 1984). Advising banks (Team Bank) act as neutral parties and are used to forge a connection between the beneficiary and the issuing bank, which already has a relationship with the cus-

tomer doing business with the beneficiary. *See id.*

8. In a standby letter of credit, such as we have here, the issuer agrees to pay the beneficiary on presentment of documentation indicating that the customer has defaulted on a payment obligation. *See Republic Nat'l Bank of Dallas v. Northwest Nat'l Bank of Fort Worth*, 578 S.W.2d 109, 113 (Tex.1978). In other words, the letter of credit did not actually represent payment for the skins. It merely represented that Mitco and ITC would be paid by NCNB if Justin otherwise defaulted on the contract after the skins were sent.

be accurate. The advising bank is responsible for its own error.").

Because the UCC is silent concerning any other statutory duties attributed to an advising bank, Team Bank contends that the only duties it assumed were to inform Mitco that the letter of credit had been issued and to accurately relate the terms of the letter of credit.[9] Thus, according to Team Bank, it had no duty to send the original letter of credit to Mitco and assumed no liability in doing so. *See* TEX.BUS. & COM.CODE ANN. § 5.106(a)(2) (Vernon 1994) (noting that a credit is established "as regards the beneficiary when he receives a letter of credit or an authorized written advice of its issuance.").

■ Team Bank supports this proposition by citing to the UCP and a number of cases from other jurisdictions that have declined to find a common-law duty between an advising bank and a letter of credit beneficiary. The UCP is a set of international customs and usages that can have the force of law when incorporated into a letter of credit. *See S.B. Int'l, Inc. v. Union Bank of India*, 783 S.W.2d 225, 226 n. 1 (Tex.App.—Dallas 1989, no writ); *see also Agri Export Co-op. v. Universal Saving Ass'n*, 767 F.Supp. 824, 828 (S.D.Tex.1991) (applying UCP to determine proper standards of presentment). The letter of credit at issue in this case expressly incorporates the UCP. Article 8 of the UCP restates the role of an advising bank:

> A credit may be advised to a beneficiary through another bank (the advising bank) without engagement on the part of the advising bank, but that bank shall take reasonable care to check the apparent authenticity of the credit which it advises.

UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS art. 8 (1983 Revision, International Chamber of Commerce Brochure no. 400).

Article 18, however, goes further to state that banks "assume no liability or responsibility for the consequences arising out of delay and/or loss in transit of any messages, letters or documents." *See id.* art. 18.

Thus, the UCP appears to expressly limit a bank's duty in relation to the transference of a letter of credit. Mitco argues the UCP distinguishes between "credits" and "documents" such that the UCP does not expressly limit liability for losing a "credit." *See id.* arts. 2, 22. However, it appears the intent of article 18 is to limit liability in situations such as we have in the case at hand.

Thus, it is clear Team Bank owed Mitco no UCC-imposed duty concerning the mailing of the letter of credit, and it is arguable that the UCP expressly limits liability concerning the mailing of the letter of credit. With this backdrop, we must decide whether Texas should recognize a common-law cause of action by a letter of credit beneficiary against an advising bank when the advising bank mishandles the mailing of a letter of credit. This is an issue of first impression in Texas. However, every jurisdiction that has considered the imposition of a common-law duty extending from an advising bank to a beneficiary (or other party) has rejected such a duty, no matter what the circumstances. *See Sound of Market Street, Inc. v. Continental Bank Int'l*, 819 F.2d 384, 390–92 (3rd Cir. 1987) (declining to impose a tort duty of timely transmission of a letter of credit running from an advising bank to a beneficiary); *Auto Servicio San Ignacio, S.R.L. v. Compania Anonima Venezolana De Navegacion*, 765 F.2d 1306, 1307–09 (5th Cir.1985) (finding that advising bank had no duty to the customer of the bank that issued the credit); *Merchants Bank of New York*, 585 F.Supp. at 308 (stating that an advising bank had no contractual obligation to the beneficiary). *See also Confeccoes Texteis de Vouzela v. Riggs Nat'l Bank of Washington, D.C.*, 994 F.2d 851, 853–54 (D.C.Cir.1993) (finding that confirming bank had no duty to issuing bank's customer); *Instituto Nacional De Comercializacion Agricola v. Continental Illinois Nat'l Bank and Trust Co.*, 858 F.2d 1264, 1270 (7th Cir.1988) (holding that confirming bank had no duty to issuing bank's customer).

Mitco argues *Sound of Market Street, Inc.* and its progeny are factually distinguishable

---

9. There is no dispute that Team Bank: (1) timely notified Mitco of the issuance of the letter of credit; (2) accurately related to Mitco the contents of the original letter of credit; and (3) played no role in, and has no liability for, the fact that the original letter of credit was not transferable (and was therefore defective).

because it had a pre-existing relationship with Team Bank (not related to the letter of credit) and Team Bank voluntarily acted outside its statutory duty. However, the fact remains that Team Bank had no contract or relationship with Mitco pertaining to the letter of credit and was hired by NCNB to perform a limited role for NCNB, not Mitco. Mitco does not cite to, and we have not found, a single case where a court has imposed a common-law duty on an advising bank in relation to a beneficiary, even where the advising bank voluntarily performed some act outside its statutory duties. Moreover, and more importantly, the basis for this apparent judicial unwillingness to create such a duty stems from the fact that:

> [j]udicial imposition of a duty running from the advising bank to the seller before the letter of credit is established is fundamentally inconsistent with the approach of the UCC and would be likely to cause uncertainty in an area where certainty is of the utmost importance.

*Sound of Market Street, Inc.*, 819 F.2d at 394.

Thus, imposition of a duty in this case could work to undermine the UCC and the ordinary customs and practices of banks in letters of credit transactions. *See Miller–Rogaska, Inc.*, 931 S.W.2d at 662. For these reasons, we hold that Team Bank owed no °duty to Mitco other than to advise Mitco that the letter of credit had been issued and to accurately relate its contents. Because Mitco has not alleged any violation of these duties, we sustain Team Bank's first point, reverse the trial court's judgment against Team Bank, and render judgment in favor of Team Bank on Mitco's negligence claim.

### B. NCNB

#### 1. Duty To Timely Transmit Letter of Credit

■ In its first point, NCNB argues: (1) article 54(c) of the UCP dictates that it owed

Mitco no duty to timely transmit the letter of credit in lieu of an express contract or agreement to transmit the letter of credit by the alleged deadline; and (2) Mitco's allegations sound in contract, if at all. Mitco argues: (1) its $825 payment to NCNB created a duty of reasonable care on the part of NCNB to transmit the letter by the alleged deadline; (2) the UCP is not controlling; and (3) NCNB is judicially estopped from asserting that Mitco's damages sound only in contract.

■ The UCP is the key to this issue. As stated above, the UCP can have the force of law when incorporated into a letter of credit. *See, e.g., S.B. Int'l, Inc.*, 783 S.W.2d at 226 n. 1. Both parties agree the UCP is incorporated into the letter of credit at issue.[10]

Article 54(c) of the UCP states:

> The bank requested to effect the transfer (transferring bank), whether it has confirmed the credit or not, shall be under no obligation to effect such transfer except to the extent and in the manner expressly consented to by such bank.

*See* UNIFORM CUSTOMS AND PRACTICES FOR DOCUMENTARY CREDITS art. 54(c) (1983 Revision, International Chamber of Commerce Brochure no. 400).

■ Thus, a bank that is retained to transmit a letter of credit makes no promises or assurances regarding the transmission except those that are "expressly consented to by such bank." *Id.* Stated another way, the UCP dictates that a bank does not undertake a duty to act in a certain way regarding the transfer of a letter of credit unless it expressly contracts or otherwise agrees to undertake such an action. *See id.*

■ Here, Mitco acknowledges that NCNB never contracted or promised to transfer the letter of credit by the alleged deadline.[11] Instead, Mitco claims: (1)

---

10. Mitco asserts there is no evidence that Little agreed to, acknowledged, acquiesced in, or even knew about any term of the UCP. However, Mitco acknowledges that Little signed the letter of credit. This was enough to have constructive or inquiry notice of the terms of the letter of credit. *See Welborn Mortg. Corp. v. Knowles*, 851 S.W.2d 328, 332 (Tex.App.—Dallas 1993, writ denied) (stating that negligent ignorance has same effect in law as actual knowledge).

11. Little apparently confirmed that no contract was entered into in her deposition, and Mitco did

NCNB was aware of the deadline; (2) Shead told Miteff and Little that meeting the deadline should not be a problem; and (3) Shead failed to exercise reasonable care to get the letter of credit to the Wire Transfer Department on the 27th so that it would be received in Germany by the alleged deadline.[12] In essence, Mitco contends that the evidence shows NCNB could have transferred the letter of credit before the deadline, and because it did not, it breached a duty of reasonable care to use its best efforts to ensure that the urgent transfer was timely sent.

■ However, Mitco cites no case law for the imposition of this alleged duty, and, in effect, asks this court to disregard the UCP's express statement that no duty will attach to the transferring bank unless the bank expressly assumes such a duty. Thus, we believe the UCP controls this situation and effectively precludes the imposition of a duty where none is affirmatively assumed. Moreover, the fact that NCNB charged a fee for its service does not, by itself, create a tort duty to ensure the timeliness of the transfer. For these reasons, we decline to find a common-law duty on the part of NCNB to transmit the letter of credit by the alleged deadline absent an agreement to do so. We sustain NCNB's first point. We reverse the trial court's judgment against NCNB and render judgment on Mitco's negligence claim in favor of NCNB. As a result, we must address NCNB's contention that the jury's

DTPA findings will not support an alternate judgment.

## 2. The Jury's DTPA Findings

■ NCNB contends the jury's DTPA findings will not support an alternate judgment. The DTPA makes unlawful the act of "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not." *See* TEX.BUS. & COM.CODE ANN. § 17.46(b)(5) (Vernon Supp. 1998). The DTPA makes misrepresentation actionable to ensure that descriptions of services offered for sale are accurate. *See Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 480 (Tex.1995); *Pennington v. Singleton,* 606 S.W.2d 682, 687 (Tex.1980). An imprecise or vague representation constitutes mere opinion and is not actionable under the DTPA. *See Humble Nat'l Bank v. DCV, Inc.,* 933 S.W.2d 224, 229 (Tex.App.— Houston [14th Dist.] 1996, writ denied). However, general or indefinite statements may support recovery under the DTPA in light of the particular facts of the case. *See id.* at 230. *See also Kessler v. Fanning,* 953 S.W.2d 515, 519 (Tex.App.—Fort Worth 1997, no writ).

■ Here, Mitco is, in effect, attempting to recast its tort and contract claims as a DTPA action by arguing it purchased a service that was performed in a manner different than was promised.[13] *See Crawford v.*

not contest this fact when Team Bank and NationsBank moved for summary judgment. Also, we note that NCNB is not judicially estopped from asserting that the action sounds in contract because of its position in its motion for summary judgment. Judicial estoppel precludes a party from taking inconsistent positions in the same proceeding. *See Goldman v. White Rose Distributing Co.,* 936 S.W.2d 393, 398 (Tex.App.—Fort Worth 1996), *agreed app. for writ granted at* 949 S.W.2d 707, *remanded without reference to the merits pursuant to settlement agreement* ). Here, Mitco cites to the trial court's summary judgment order for the proposition that NCNB has taken inconsistent positions. However, the record reveals NCNB moved for summary judgment on *both of Mitco's causes of action* claiming it neither entered into a contract to timely transfer the letter of credit nor owed an independent tort duty to timely transfer the letter of credit. That the trial court only granted summary judgment

on the contract issue does not mean Mitco is judicially estopped from re-asserting its tort-related defenses on appeal.

12. We note that Shead testified she made no such assurances regarding the processing of the transfer and that is was the policy of her office to process all transfer requests in the order they came in, regardless of the urgency of the request.

13. On appeal, Mitco also claims it relied upon assurances that NCNB would follow its procedures to insure the timely transmission of the letter of credit. This claim was not raised at trial. *See, e.g., Land Liquidators of Texas, Inc. v. Houston Post Co.,* 630 S.W.2d 713, 714 (Tex. App.—Houston [14th Dist.] 1982, no writ). In any event, Mitco cites no evidence that NCNB made such assurances and the uncontroverted evidence is that the letter of credit was properly sent and received in Germany. This claim is

*Ace Sign, Inc.,* 917 S.W.2d 12, 14 (Tex.1996) (discussing differences between contract and DTPA action); *Southwestern Bell Tel. Co. v. DeLanney,* 809 S.W.2d 493, 495 (Tex.1991) (discussing differences between tort and contract actions). *Cf. Walden v. Jeffery,* 907 S.W.2d 446, 447 (Tex.1995) (finding that DTPA claim against dentist was nothing other than claim of negligence). An allegation of breach of contract by way of nonfeasance, without more, does not constitute a false, misleading, or deceptive act in violation of the DTPA. *See Crawford,* 917 S.W.2d at 14 (discussing nature of nonfeasance in a contract situation). Moreover, mere failure to perform a promise will not normally constitute a misrepresentation. *See Holloway v. Dannenmaier,* 581 S.W.2d 765, 767 (Tex.Civ. App.—Fort Worth 1979, writ dism'd).

As stated above, both Little and Miteff admitted at trial that neither Shead nor anyone else at NCNB ever promised to meet the deadline or transfer the letter of credit by a certain time. In fact, Shead testified it was neither her nor NCNB's practice to make any promises concerning the transmission of letters of credit. Even in the light most favorable to Mitco, Shead's statements merely amount to vague representations that NCNB would try to accommodate Mitco's deadline. *See Humble Nat'l Bank,* 933 S.W.2d at 229; *Kessler,* 953 S.W.2d at 519–20. Shead's statements do not amount to an actionable representation in light of the fact that NCNB was the only one who could transfer the letter of credit, and Shead apparently told Little and Miteff that she was making no promises or guarantees about the deadline. *See Humble Nat'l Bank,* 933 S.W.2d at 229; *Kessler,* 953 S.W.2d at 519–20. In effect, NCNB's statements were basically accurate. *See Doe,* 907 S.W.2d at 480 (stating that DTPA is designed to ensure that descriptions of services offered for sale are accurate). That Mitco was unhappy with the services as provided does not mean NCNB is automatically subject to liability under the DTPA. *See Crawford,* 917 S.W.2d at 14; *Holloway,* 581 S.W.2d at 767. For these reasons, we hold NCNB's alleged representations were not actionable and the

more akin to a breach of an implied warranty

jury's DTPA findings will not support the entry of an alternative judgment in favor of Mitco.

### IV. CONCLUSION

We reverse the trial court's judgment and render a take-nothing judgment in favor of Team Bank and NCNB.

claim. *See Crawford,* 917 S.W.2d at 14–15.