Opinion issued March 15, 2016



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-09-00328-CV

————————————

**SAMSON LONE STAR LIMITED PARTNERSHIP, N/K/A SAMSON LONE STAR, L.L.C., Appellant/Cross-Appellee**

**V.**

**CHARLES G. HOOKS, III, INDIVIDUALLY AND AS INDEPENDENT EXECUTOR OF THE ESTATE OF CHARLES G. HOOKS, JR., AS TRUSTEE OF THE SCOTT IRA MCKEEVER TRUST AND THE DAVID WAYNE MCKEEVER TRUST, AND ON BEHALF OF CHAS. G. HOOKS & SON, A GENERAL PARTNERSHIP, MCKEEVER PARTNERSHIP, LTD., AND CHARLES G. HOOKS III AND SUE ANN HOOKS, AS CO-TRUSTEES UNDER THE WILL OF CHARLES G. HOOKS, SR., Appellees/Cross-Appellants**

---

**On Appeal from the 60th District Court**
**Jefferson County, Texas**
**Trial Court Case No. B173008B**

---

## OPINION

Samson Lone Star Limited Partnership, *n/k/a* Samson Lone Star, L.L.C. ("Samson"), originally appealed the trial court's final judgment in favor of appellees, Charles G. Hooks, III, Individually and as Independent Executor of the Estate of Charles G. Hooks, Jr., as Trustee of the Scott Ira McKeever Trust and the David Wayne McKeever Trust, and on Behalf of Chas. G. Hooks & Son, a General Partnership, McKeever Partnership, Ltd., and Charles G. Hooks III and Sue Ann Hooks, as Co-Trustees Under the Will of Charles G. Hooks, Sr. (collectively, "Hooks"). The judgment arose from an oil and gas case Hooks filed against Samson with respect to three oil and gas leases, two in Hardin County, Texas and one in Jefferson County. Hooks asserted multiple causes of action against Samson, including breach of contract, fraud, fraudulent concealment, statutory fraud, and negligent misrepresentation. The trial court granted summary judgment in favor of Samson on Hooks' claim that Samson breached certain offset obligations under the leases, and it granted summary judgment in favor of Hooks on his claim that Samson breached the "most favored nations" clause in the leases and breached the leases related to the "unpooling" of Hooks' two leases in Hardin County. The issues of fraud and underpayment of royalties on "formation production" were tried to a jury, which found in Hooks' favor. The trial court's final judgment

2

awarded Hooks more than $21 million in damages based on the summary judgment rulings and the jury's verdict.

On appeal, this Court reversed the judgment in favor of Hooks except for an agreed ad valorem tax payment. *See Samson Lone Star, Ltd. P'ship v. Hooks*, 389 S.W.3d 409, 439 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part and rev'd in part*, 457 S.W.3d 52 (Tex. 2015). The Texas Supreme Court reversed our holding that the fraud claims and breach of offset obligations under the Hardin County Leases were barred by limitations and our holding that Samson had not breached the most-favored-nations clause. *Hooks v. Samson Lone Star, Ltd. P'ship*, 457 S.W.3d 52, 61, 63, 69 (Tex. 2015). It affirmed in part and reversed in part our determination of the applicable post-judgment interest rate, and it affirmed our holdings on the formation-production and unpooling claims. *Id.* at 65–66, 70. It remanded the case to this Court for us to consider the factual sufficiency of the jury's fraud limitations findings, the legal and factual sufficiency of the jury's findings on Hooks' fraud claims, the damages for Hooks' claim that Samson breached the most-favored-nations clause, and the merits of Hooks' claim that Samson breached its offset obligations under his leases in Hardin County.

On remand, Samson argues that: (1) & (2) the evidence was legally and factually insufficient to support the jury's verdict on Hooks' common law and statutory fraud claims; (3) the evidence was legally and factually insufficient to

support the damages awarded on Hooks' fraud claims, which requires a remand "for a reduction and recalculation of the fraud damages, including attendant prejudgment and post-judgment interest issues"; (4) the evidence was factually insufficient to support the jury's finding on limitations for the fraud claim; and (5) we must recalculate the damages owed to Hooks' based on his most-favored-nations claim, including the applicable rate of prejudgment interest.

In a single cross issue, Hooks challenges the trial court's denial of its motion for summary judgment on his claims that Samson breached certain offset obligations with respect to the Hardin County Leases.

We reverse the trial court's judgment and remand for a new trial, unless Hooks accepts the remittitur we suggest below, in which case we will modify the judgment and affirm as modified.

## I. SAMSON'S APPEAL ON REMAND

### Background

### A.    *Hooks' Fraud Claim Relating to the Jefferson County Lease*

In 1999, Hooks entered into an oil and gas lease with Samson covering 640 acres Hooks owns in Jefferson County (the "Jefferson County Lease"). Hooks also entered into two oil and gas leases with Samson covering tracts in Hardin County—a 95-acre tract and a 10-acre tract (the "Hardin County Leases"). All three leases, including the Jefferson County Lease, contained a section called

"Offset Obligations," in which Samson covenanted to operate the leased premises as a reasonably prudent operator would and to protect the leased premises from drainage. The offset obligation provision specifically provided that if a gas well were completed within 1,320 feet from the leased premises, then, within 90 days from the date of the sale of first production from that well, Samson must take one of three actions: (1) commence with due diligence operations for the actual drilling of an offset well; (2) pay Hooks "compensatory royalties"—in addition to any royalties currently due—in a sum equal to the royalties that would be payable under the Lease on the production from the adjacent or nearby producing well as if it had been producing on the leased premises; or (3) release the offset acreage. The Jefferson County Lease did not provide for pooling.

The Lease also contained a provision providing for a "late charge" for unpaid royalties:

> All past due royalties (including any compensatory royalties payable under [the offset obligations provision]) shall be subject to a Late Charge based on the amount due and calculated at the maximum rate allowed by law commencing on the day after the last day on which such monthly royalty payment could have been timely made and for each calendar month and/or fraction thereof from the date until paid, plus attorney's fees, court costs, and other costs in connection with the collection of the unpaid amounts. Any Late Charge that may become applicable shall be due and payable on the last day of each month when this provision becomes applicable.

Hooks' Leases contained a "most favored nations" clause providing that, under certain circumstances, the royalties payable to Hooks must be elevated to match the highest royalty payable to Samson's other lessors.

In March 2000, a third-party surveyor created a plat for a proposed gas well, the Black Stone Minerals No. 1 ("BSM 1 well"), on a tract adjacent to the Jefferson County Lease. This plat showed that the surface drillsite was outside the 1,320-foot buffer zone around Hooks' Jefferson County Lease that triggered Samson's offset obligations under the Lease. However, the well was a directional well that slanted away from the surface drillsite, and the plat showed that Samson planned for a bottom hole location 1,080 feet from Hooks' Jefferson County Lease. Samson filed the March 2000 plat with the Railroad Commission of Texas.

In April 2000, Samson began to drill the BSM 1 well. A directional survey, completed in July 2000 and also filed with the Railroad Commission, showed that the BSM 1 well bottomed 1,184 feet from Hooks' Jefferson County Lease, within the 1,320-foot buffer zone. Samson completed the BSM 1 well in August 2000, and the first gas sales occurred in late October 2000.

Samson then began the process of reconfiguring the BSM 1 pooling unit. A new plat, dated November 16, 2000, incorrectly placed the well's bottom hole at "±1400′ scaled" from the border of Hooks' Jefferson County Lease. In December 2000, Samson filed a copy of this plat with the Railroad Commission as part of an

6

application to pool. As the supreme court pointed out, the plat was signed by Samson's landman, Glenn Lanoue, who certified that it was "a true and correct plat based on the best of my knowledge." *See Hooks*, 457 S.W.3d at 59–60.

At trial, Lanoue testified regarding the creation of that plat. He did not give the surveyor the information from the directional survey showing the exact location of the BSM 1 well bottom hole. Rather, he sent the surveyor information indicating that the bottom hole of the BSM 1 well was "740 feet from the east line and 290 feet from the south line," which resulted in the notation on the plat that the bottom hole was "±1400′ scaled" from the Jefferson County Lease. He testified at trial that he created these notations himself. He further testified that he intended the numbers to be "[a]s accurate as a land guy is using a ruler on a scaled piece of paper that might not even be to scale."

On February 15, 2001, Samson sent Hooks a letter offering to pool 50 acres covered by the Jefferson County Lease into the re-designated BSM 1 pooling unit. Attached to the letter was a copy of the plat of the reconfigured unit that Samson had filed with the Railroad Commission in December 2000.

On February 20, 2001, before accepting Samson's offer to pool—which would require amendment of Hooks' Jefferson County Lease to permit pooling— Charles Hooks, a landowner and an attorney who had participated in a number of oil and gas deals and who managed his family's oil and gas interests, called

7

Lanoue and sought more information. Charles Hooks inquired about the BSM 1 well's location and about how his property fit into the proposed pooling unit. Lanoue told him that the well was about 1,500 feet away from the boundary line of Hooks' Jefferson County Lease.

Hooks requested a plat showing where his acreage would lie within the proposed reconfigured BSM 1 unit. That same day, Lanoue sent Hooks the scaled plat of the re-designated BSM 1 pooling unit that Samson had filed with the Railroad Commission in December 2000. This plat did not use the exact location of the BSM 1 well's bottom hole as determined by the directional survey completed in July 2000, but showed that it was "1,400′± FEL Unit," or approximately 1,400 feet from the eastern line of the BSM unit. The coordinates for the bottom hole location placed the well outside the Jefferson County Lease's buffer zone.

Hooks testified that he understood the plat to show the bottom hole location as falling outside the buffer zone for his lease, which he believed confirmed Lanoue's representation during their phone call that the bottom hole of the well fell about 1,500 feet beyond the Jefferson County Lease line. Likewise, Paul Beale, a geophysicist and vice-president for Samson, agreed that the plat Lanoue sent to Hooks showed that the well fell outside the buffer zone. Brian Sullivan, one of Samson's own expert witnesses, examined the plat Samson had provided to Hooks

and testified that, assuming the accuracy of the notation that the bottom hole of the BSM 1 well was "740 feet" from the east line of the unit, the plat showed that the scaled distance between the BSM 1 bottom hole and Hooks' lease was approximately 1,480 feet. And Nedra Foster, Hooks' survey expert, testified that the plat was "fairly clear" that the bottom hole was "about, plus or minus, 1,400 feet" from Hooks' lease line.

After making the pooling offer to Hooks, Lanoue executed the designation of the BSM 1 pooling unit in February 2001 and recorded it in the county's real property records on March 7, 2001, showing Hooks as participating in the pool for the BSM 1 unit. However, Hooks did not actually consent to pool the fifty acres from his Jefferson County Lease into the BSM 1 unit until May 25, 2001, and he conditioned his assent on a formal amendment to the Jefferson County Lease which he was to prepare and submit to Samson. Hooks did not submit the formal amendment, however, and the parties never executed such an amendment. Instead, Hooks agreed to a division order setting out his percentage of the unit's proceeds, which stated that Samson would pay Hooks royalties based on a stated percentage of his acreage in the unit to the entire acreage of the BSM 1 unit unless notified otherwise in writing.

After Hooks agreed to be included in the BSM 1 unit, Samson sent royalty checks to Hooks for his unit interest continuing through the time of trial, and

9

Hooks cashed those checks. However, the royalty checks did not include compensatory royalties calculated under the terms of the offset provision in the Jefferson County Lease for a well drilled within the 1,320-foot buffer zone. Hooks asserts that the amount of royalty under the pooling agreement was approximately one-fourteenth of what he would have received under his contractual right to compensatory royalties.

After Hooks agreed to pool fifty acres of his Jefferson County Lease into the BSM 1 unit, Samson drilled a second well, the Joyce DuJay No. 1 well ("DuJay 1 well"), within the 1,320-foot buffer zone of Hooks' Jefferson County Lease. That well was completed in January 2002 and was made part of another pooling unit, the DuJay 1 unit, in which Hooks also participated and from which he received royalties. This well was offset by the BSM 1 unit. Hooks testified that no one at Samson made any fraudulent statements to him specifically regarding the DuJay 1 unit. However, Hooks' damages expert, Charles Graham, testified that Samson's fraud in procuring Hooks' agreement to pool his lease into the BSM 1 unit led Hooks to believe that the offset obligations as to the DuJay 1 well were met by the BSM 1 well.

## B. *Procedural History*

In the fall of 2006, Charles Hooks attended a seminar for oil and gas attorneys and met another attorney who was representing some third-party lessors

10

in a lawsuit against Samson based on complaints of pooling issues unrelated to the BSM 1 well. On November 16, 2006, Hooks joined that lawsuit, but his claims were later severed into this separate cause of action. Hooks originally asserted causes of action for breach of contract and common law and statutory negligence. After obtaining discovery that revealed the misleading nature of the information he received from Samson prior to consenting to pool a portion of his Jefferson County Lease into the BSM 1 unit, Hooks amended his suit in May 2007 to add his fraud claims.

The trial court rendered partial summary judgment on some of Hooks' claims. Relevant to our consideration of this case on remand, the trial court rendered summary judgment in Hooks' favor on his claim that Samson breached the most-favored-nations clause.

Hooks presented expert testimony and documents supporting his claim for damages, including evidence of what the compensatory royalties would have been for both the BSM 1 and DuJay 1 wells had he not been fraudulently induced into pooling rather than enforcing the offset obligations in the Jefferson County Lease. The expert evidence demonstrated that the unpaid compensatory royalties for production from the BSM 1 well totaled $3,553,200.15; the unpaid compensatory royalties for production from the DuJay 1 well totaled $3,112,015.22; the unpaid

royalty on "formation production"[1] from the BSM 1 well totaled $504,368.64; the unpaid royalty on formation production from the DuJay 1 well totaled $426,550.01; the amounts due under the Lease's late charge provision totaled $12,995,832.05; and the credit to Samson for royalties it had already paid under the fraudulent pooling agreement totaled $510,328.01.

Regarding the jury charge, Samson objected to a portion of the charge on fraud. It specifically objected to the inclusion of the statement, "You are instructed that when a party makes a representation and later acquires new information which makes the representation untrue or misleading, the party must disclose such information to anyone whom he knows to be still acting on the basis of the original statement." However, it did not object to the remainder of the fraud question setting out the elements of fraud, defining "misrepresentation" as meaning "a false statement of fact," and providing an instruction that fraud can also occur when a party fails to disclose a material fact under certain circumstances. The trial court overruled Samson's objection.

---

[1]    Formation Production is the calculation of the total amount of natural gas taken from a gas reservoir in whatever form it arrives at the surface, whether in the form of gas or in the form of liquid condensate. Formation production calculations allow the Railroad Commission to track the amount of gas coming out of the ground to avoid overproduction. *Samson Lone Star, Ltd. P'ship*, 389 S.W.3d 409, 436 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part and rev'd in part*, 457 S.W.3d 52 (Tex. 2015).

Samson also objected to the instruction on damages. It argued that allowing the jury to consider "lost income to the Hooks that was a natural, probable, and foreseeable consequence of Samson's fraud" was not the proper measure of damages. It argued that the "[p]roper measure of damages in a fraud case is what you gave up versus what you received." Samson asserted that the alleged fraud induced Hooks to give up "his right to sue Samson in February of 2001 for breach of contract, which means the measure of damages is what was the value of that breach of contract lawsuit that he gave up in February versus what he actually ended up receiving." Hooks argued that the instruction properly addressed proximate cause for consequential damages. The trial court denied Samson's objection.

Hooks and Samson agreed to certain stipulations that were entered into the trial court's record. Regarding damages, the parties stipulated to the amount of damages for "[u]npaid royalty on production through May 2008, plus late charges as of August 1, 2008," for the various wells and units both including and not including Hooks' claims for royalties based on formation production. They stipulated to $212,825.25 in lost royalties and $218,625.46 in late charges for the DuJay 1 well and unit. The parties also entered into a stipulation regarding attorney's fees.

13

The jury found that Samson committed fraud against Hooks. It further found that the sum of money that would fairly and reasonably compensate Hooks for the damages proximately caused by such fraud was $20,081,638.07. Finally, the jury found that Hooks, in the exercise of reasonable diligence, should have discovered Samson's fraud by "Hooks' Birthday April 2007."[2]

Pursuant to the jury's findings, the trial court's summary judgment ruling on Hooks' claim for breach of the most-favored-nations clause, and the stipulations of the parties, the trial court rendered judgment in favor of Hooks, awarding $20,081,638.07 for damages proximately caused by fraud, $848,854.01 as damages for breach of the most-favored-nations clause, and damages related to ad valorem taxes in the amount of $52,257.22.[3] The trial court also awarded Hooks attorney's fees consistent with the parties' stipulation on that issue, and it awarded expert witness fees, costs for copies of depositions, pre-judgment interest, and post-judgment interest at a rate of 18% compounded annually.

**Fraud**

Samson challenges the sufficiency of the evidence of the jury's findings relating to Hooks' fraud claims.

---

[2]    Hooks' birthday is not in April, but this is what the jury answered.

[3]    The trial court also awarded Hooks $766,626.85 as damages for his "unpooling" claim related to yet another well, the Black Stone Minerals A-1 well. We reversed this portion of the trial court's judgment, and the supreme court affirmed our judgment on this issue.

*A.    Standard of Review*

In reviewing a legal sufficiency challenge to the evidence, we view the evidence in the light most favorable to the finding, crediting favorable evidence if a reasonable factfinder could, and disregarding contrary evidence unless a reasonable factfinder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A party bringing a legal sufficiency challenge to a finding on which it did not have the burden of proof must demonstrate that there is no evidence to support the adverse finding. *See Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We may not sustain a legal sufficiency or no-evidence point unless the record demonstrates that: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by the rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence to prove a vital fact is no more than a scintilla; or (4) the evidence established conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. The factfinder is the sole judge of the witnesses' credibility and the weight to give their testimony. *Id.* at 819.

In reviewing the factual sufficiency of the evidence, we are required to examine all of the evidence, and we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Unlike a legal-sufficiency

review, a factual-sufficiency review requires that we review the evidence in a neutral light. *Id.*; *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). The factfinder may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see also City of Keller*, 168 S.W.3d at 819–21.

### B.    *Statute of Limitations for Fraud*

Samson challenges the factual sufficiency of the evidence supporting the jury's finding that, exercising reasonable diligence, Hooks could not have discovered his fraud claim until April 2007. The supreme court determined that the question of when Hooks could have discovered Samson's fraud was properly a question of fact for the jury and that the evidence was legally sufficient to support the jury's finding that Hooks could not have discovered Samson's fraud until April 2007. *See Hooks*, 457 S.W.3d at 61. It remanded the issue for us to consider the factual sufficiency of the evidence supporting the jury's finding. *See id.* Samson now argues that Hooks' testimony stated only when he discovered the claim and that he did not testify as to "why, in the exercise of reasonable diligence (as an experienced oil and gas attorney and mineral owner), he could not have discovered his claim earlier."

As a general rule, a cause of action accrues and the limitations period begins to run when facts come into existence that authorize a party to seek a judicial remedy. *Exxon Corp.*, 348 S.W.3d at 202. Generally, the limitations period for a fraud claim is four years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004 (Vernon 2002). However, under certain circumstances, limitations will not begin to run until the plaintiff "knew or should have known of facts that in the exercise of reasonable diligence would have led to the discovery of the wrongful act." *Exxon Corp.*, 348 S.W.3d at 216; *see also Hooks*, 457 S.W.3d at 56–57 (discussing discovery rule in relation to this case). Here, the supreme court held that "[b]ecause 'fraud vitiates whatever it touches,' limitations does not start to run until the fraud is discovered or the exercise of reasonable diligence would discover it." *Hooks*, 457 S.W.3d at 57 (quoting *Borderlon v. Peck*, 661 S.W.2d 907, 909 (Tex. 1983) and citing *BP Am. Prod. Co. v. Marshall*, 342 S.W.3d 59, 69 (Tex. 2011)).

The supreme court further held "that when the defendant's fraudulent misrepresentations extend to the Railroad Commission record itself, earlier inconsistent filings cannot be used to establish, as a matter of law, that reasonable diligence was not exercised. Under these circumstances, reasonable diligence remains a fact question." *Hooks*, 457 S.W.3d at 61. The supreme court went on to state that "[t]he factfinder, no doubt, may consider [Hooks'] failure to examine older records when determining whether reasonable diligence was exercised, but

17

their availability is not enough to establish that reasonable diligence was not exercised as a matter of law." *Id.* Accordingly, because the supreme court remanded for us to consider the factual sufficiency of the evidence supporting the jury's finding, we are required to examine all of the evidence in a neutral light, and we will set aside the jury's verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

The evidence at trial showed that the public records themselves were inconsistent. Samson originally filed the March 2000 plat with the Railroad Commission showing the proposed location of the BSM 1 well. It showed that Samson planned for a bottom hole location 1,080 feet from Hooks' Jefferson County Lease. Samson also filed a directional survey, completed in July 2000, showing that the BSM 1 well bottomed 1,184 feet from Hooks' Jefferson County Lease, within the 1,320-foot buffer zone. However, Samson subsequently filed a new plat, dated November 16, 2000, that incorrectly placed the well's bottom hole at "±1400′ scaled" from the border of Hooks' Jefferson County Lease. This is the same plat that Samson sent to Hooks to procure his consent to pool a portion of his lease into the BSM 1 unit.

Although Hooks did not testify explicitly regarding why he did not discover the fraud claim earlier, he did testify that he inquired with Samson, by speaking

18

with Glenn Lanoue, about the exact location of the well and his Lease's location within the BSM 1 pooling unit because he wanted to know whether the well drilled close to his lease line might trigger the offset obligations. He also testified that he requested a plat to confirm Lanoue's representation that the well's bottom hole was located 1,500 feet from his Lease. The information that Samson gave him did not convey the exact location of the well's bottom hole as established by the directional survey, but instead identified the location of the well's bottom hole as "±1400′ scaled" from the border of Hooks' Jefferson County Lease. Hooks testified that he understood this notation to confirm Lanoue's representation over the phone that the well fell outside the buffer zone for his Jefferson County Lease, and he relied upon those representations. Although some experts acknowledged that the "±" notion implied that there could be as much as a 100-foot margin on the measurements, others—including Beale, Samson's vice president, and Foster, Hooks' survey expert—testified that the plat showed that the well's bottom hole fell outside the buffer zone, consistent with Hooks' own interpretation.

Hooks testified that he was an attorney and had extensive experience with the oil and gas industry. He further testified that he did not become aware of larger problems with his lease until he attended the oil and gas conference in Fall 2006 and learned of litigation pending against Samson. During the course of litigation, Samson produced documents through discovery that revealed the actual location of

19

the BSM 1 well's bottom hole and Samson's use of misleading plats to obtain his consent to pool.

In light of this conflicting evidence, the jury had the discretion to resolve the conflicts by determining that Hooks had exercised reasonable diligence in requesting information from Samson and that the existence of relevant information buried within conflicting public records did not sufficiently put him on notice of his fraud claims prior to April 2007. *See Exxon Corp.*, 348 S.W.3d at 216; *see also Hooks*, 457 S.W.3d at 56–57.

We overrule Samson's challenge to the factual sufficiency of the evidence supporting the jury's finding that Hooks, in the exercise of reasonable diligence, would not have necessarily discovered his fraud claim prior to April 2007.

## C. *Fraud Claims*

Samson challenges the legal and factual sufficiency of Hooks' common-law and statutory fraud claims.

To prevail on a fraud claim, the plaintiff must prove that the defendant (1) made a material misrepresentation, (2) knew the representation was false or made it recklessly without any knowledge of its truth, (3) intended that the plaintiff would act upon the representation or intended to induce the plaintiff's reliance on the representation, and that (4) the plaintiff justifiably relied upon the representation and thereby suffered injury. *Exxon Corp.*, 348 S.W.3d at 217. To

prove fraudulent inducement, these same elements of fraud must be established as they relate to a contract. *Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no pet.).

### 1.     *Material Misrepresentation*

First, Samson argues that the evidence was insufficient to show that it made an actionable misrepresentation. Samson argues that "[t]he plat was marked 'scaled,' meaning it was inexact and the distance upon which [Hooks] testified he relied said '1400′± Scaled.'" It asserts that this notation was "too indefinite to form the basis of a misrepresentation when someone is attempting to determine whether a well is 1320 feet from a lease line."

A material representation is one which "a reasonable person would attach importance to and would be induced to act on . . . in determining his choice of actions in the transaction in question." *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (quoting *Smith v. KNC Optical, Inc.*, 296 S.W.3d 807, 812 (Tex. App.—Dallas 2009, no pet.)). However, "[v]ague representations cannot constitute a material representation actionable under our laws." *Cadle Co. v. Davis*, No. 04-09-00763-CV, 2010 WL 5545389, at *8 (Tex. App.—San Antonio Dec. 29, 2010, pet. denied) (mem. op.) (citing *In re Media Arts Grp., Inc.*, 116 S.W.3d 900, 910 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding [man. denied]) (statement "don't worry about it" was too vague to

21

constitute material misrepresentation in claim of fraudulent inducement); *Bank One, Tex., N.A. v. Little*, 978 S.W.2d 272, 280 (Tex. App.—Fort Worth 1998, pet. denied) (imprecise or vague representation constitutes mere opinion and is not actionable misrepresentation under DTPA); *Hedley Feedlot, Inc., v. Weatherly Trust*, 855 S.W.2d 826, 839 (Tex. App.—Amarillo 1993, writ denied) (imprecise statement not actionable misrepresentation under DTPA)).

Hooks testified that, before agreeing to pool a portion of his lease into the BSM 1 unit, he contacted Lanoue to inquire about the BMS 1 well's location and about how his property fit into the unit. During their phone conversation, Lanoue represented that the BSM 1 well was located 1,500 feet from the boundary of Hooks' lease. Lanoue subsequently sent Hooks a copy of the plat that Samson had filed with the Railroad Commission in December 2000 to confirm his representation regarding the well's location. This plat did not use the exact location of the BSM 1 well's bottom hole as determined by the directional survey completed in July 2000, but instead showed that it was "1,400′± FEL Unit," or approximately 1400 feet from the eastern line of the BSM unit. The coordinates for the bottom hole location placed the well outside the Jefferson County Lease's 1,320-foot buffer zone. Hooks testified that he understood the plat sent to him by Lanoue to show that the bottom hole's location fell outside the buffer zone for his lease, which he believed confirmed Lanoue's representation during their phone call

that the bottom hole of the well fell about 1,500 feet beyond the Jefferson County Lease line.

Although Lanoue's representation over the phone and the notations on the plat regarding the location of the well were not precise, neither were they such vague or imprecise representations that they cannot constitute a material representation for fraud purposes. *See Cadle Co.*, 2010 WL 5545389, at \*8; *In re Media Arts Group, Inc.*, 116 S.W.3d at 910. This is especially true here, where the exact location of the well was highly relevant to Hooks' decision regarding pooling and both parties were aware of the circumstances that made the location of the well's bottom hole material, such that Samson should have known that Hooks would rely on its information. In representing the location of the BSM 1 well's bottom hole, Samson—as the party with superior access to the relevant information—provided an answer to Hooks' inquiry's regarding the location of the well and his lease's location within the proposed pooling unit by supplying inaccurate or imprecise information even though it had a survey showing the exact location of the well's bottom hole. Hooks testified that he relied on the answer to this inquiry when he agreed to pool fifty acres of his Jefferson County Lease into the BSM 1 unit at Samson's request. *See Italian Cowboy*, 341 S.W.3d at 337 (stating that material representation is one which "a reasonable person would attach importance to and would be induced to act on").

We conclude that the record contains legally sufficient evidence of an actionable, material misrepresentation. *See Italian Cowboy*, 341 S.W.3d at 337; *City of Keller*, 168 S.W.3d at 827.

Samson points out that witnesses acknowledged that there could be as much as a 100 foot "tolerance." However, other witnesses, including Hooks—an attorney with extensive experience managing oil and gas deals—Hooks' survey expert, Foster, and Beale, Samson's vice-president, testified that the plat demonstrated that the BSM 1 well was located outside the buffer zone. The jury was the exclusive judge of the credibility of these witnesses and the weight to be given to their testimony, and it was entitled to "believe one witness and disbelieve others" and "resolve conflicts" in the evidence. *See City of Keller*, 168 S.W.3d at 819–21; *McGalliard*, 722 S.W.2d at 697. Thus, we conclude that the evidence was likewise factually sufficient to demonstrate the existence of a material misrepresentation.

### 2. *Intent to Induce Reliance*

Samson also argues that there is no evidence it had any intent to defraud Hooks when it supplied the plat. In Texas's fraud jurisprudence, courts considering the intent element focus on the defendant's knowledge and intent to induce reliance. *Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 578 (Tex. 2001). A defendant who acts with knowledge that a result will follow is considered to intend the result. *Id.* at 579. A party's intent is determined at the time

24

that it makes the complained-of representation; however, intent may be inferred from the party's acts made after the representation. *Aquaplex Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009). "[I]ntent to defraud is not usually susceptible to direct proof." *Id.* at 774–75. Thus, intent to defraud, or intent to induce reliance, most often must be proven by circumstantial evidence. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986). "Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Id.* at 434.

In response to Samson's request that he pool a portion of his Jefferson County Lease into the BSM 1 unit, Hooks made inquiries regarding the location of the BSM 1 well and his Lease's location within the unit. At the time of this inquiry, Samson had already received the results of the directional survey showing the exact location of the BSM 1 well's bottom hole to be 1,184 feet from Hooks' Jefferson County Lease, within the buffer zone. And it had filed a plate with this information with the Railroad Commission. Nevertheless, Lanoue told Hooks over the phone that the well was 1,500 feet away from his lease line, which was outside the buffer zone, and Samson sent Hooks a plat showing that the well's bottom hole was "1400′±" from Hooks' lease line, which was likewise outside the buffer zone. After making the pooling offer to Hooks, but before Hooks agreed to pool, Lanoue

executed the designation of the BSM 1 pooling unit in February 2001 and recorded it in the county's real property records on March 7, 2001, showing Hooks as participating in the pool for the BSM 1 unit.

The timing of these actions—that Samson used an inaccurate and misleading plat when it already knew the exact location of the bottom hole in addressing Hooks' inquiries related to pooling a portion of lease and that Samson filed documents with the Railroad Commission indicating that Hooks was part of the pooling unit before he consented to the pooling—is circumstantial evidence of Samson's intent to induce Hooks' reliance on its representations in agreeing to pool. *See Aquaplex Inc.*, 297 S.W.3d at 775; *Spoljaric*, 708 S.W.2d at 435. The record indicates that, at the time it misrepresented the location of the BSM 1 well's bottom hole, Samson knew that it had drilled the well within the Jefferson County Lease's buffer zone, thereby triggering the offset obligations under the terms of the Lease. Rather than meet its obligations, Samson sought Hooks' consent to pool. In the course of obtaining Hooks' consent, it used an inaccurate plat. The payments that Samson made to Hooks under the pooling agreement were considerably less than the payments that would have been due under the compensatory royalty provision in the Jefferson County Lease's offset obligations.

Samson points to Lanoue's testimony that he thought Hooks wanted the plat to see where his lease was located within the unit, and the plat accurately

26

represented that information. Hooks himself admitted that he might not have told Samson why he cared about the locations of the BSM 1 well. However, the jury considered all of the testimony and evidence presented, as recounted above, and this evidence is not so overwhelming as to render the jury's findings clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

Considering Samson's knowledge and the circumstantial evidence of its intent to induce reliance, we conclude that the evidence was legally and factually sufficient to demonstrate intent. *See Ernst & Young, L.L.P.*, 51 S.W.3d at 578; *see also City of Keller*, 168 S.W.3d at 827.

### 3. *Justifiable Reliance*

Samson argues that Hooks ignored the "±" part of the plat and "could not justifiably have relied on such an indefinite measurement when he was looking for a precise answer to his supposed question—a question he never even posed to Samson."

Fraud also requires that the plaintiff show actual and justifiable reliance. *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 923 (Tex. 2010). "In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'" *Id.* (quoting *Haralson v. E.F.*

27

*Hutton Grp., Inc.*, 919 F.2d 1014, 1026 (5th Cir. 1990)). Reliance is not justified if there are "red flags" indicating such reliance is unwarranted. *Id.* The plaintiff must prove that based on the alleged misrepresentation, he either took an action or failed to take an action, which caused him harm. *O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 421 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *see also Van Marcontell v. Jacoby*, 260 S.W.3d 686, 691 (Tex. App.—Dallas 2008, no pet.) ("A plaintiff establishes reliance by showing the defendant's acts and representations induced him to either act or refrain from acting, to his detriment."). The issue of justifiable reliance is generally a question of fact.[4] *See Prize Energy Res., L.P. v. Cliff Hoskins, Inc.*, 345 S.W.3d 537, 584 (Tex. App.—San Antonio 2011, no pet.); *1001 McKinney Ltd. v. Credit Suisse First Bos. Mortg. Capital*, 192 S.W.3d 20, 30 (Tex. App.—Houston [14th Dist.] 2005, pet. denied).

---

[4] The issue of justifiable reliance may become a question of law when the undisputed or conclusively proven facts demonstrate circumstances under which reliance cannot be justified—such as when the party had actual knowledge of the representation's falsity or the representation directly contradicts the express terms of a written agreement. *See, e.g.*, *JSC Neftegas-Impex v. Citibank, N.A.*, 365 S.W.3d 387, 407–09 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) (op. on reh'g) (reliance on representation not justified, as matter of law, when party had actual knowledge of representation's falsity); *DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 47 (Tex. App.—Houston [1st Dist.] 2008, no pet.) ("[R]eliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law."). However, the circumstances here raise a question of fact. Just as the question of what constituted reasonable diligence in discovering the fraud was a fact issue to be determined by the jury, *see Hooks*, 457 S.W.3d at 60, so too is the question of whether Hooks was justified in relying on Samson's verbal and written representations where there was some contradicting information available in the public record.

Hooks is an attorney with considerable experience managing oil and gas interests. He testified that he inquired about the exact location of the well and of his Lease within the BSM 1 pooling unit because it was important to him to know whether the well was within the buffer zone of his Jefferson County Lease. Hooks—like Samson itself—was aware of the offset obligations in the Jefferson County Lease that could be triggered by drilling close to his Lease line. He testified that he would not have consented to pool if he had known that the bottom hole of the well actually fell within the buffer zone. Furthermore, other witnesses, including Beale and Foster, testified that it was reasonable to interpret the plat relied upon by Hooks—the same plat Samson had filed with the Railroad Commission—as showing that the well fell outside the buffer zone.

Thus, there was sufficient evidence to support the jury's determination that, given his individual characteristics, abilities, and appreciation of facts and circumstances here, Hooks justifiably relied upon Samson's representations regarding the location of the well. *See Grant Thornton LLP*, 314 S.W.3d at 923. The facts that the plat included notations that the distances were "scaled" and included a "±" marking—indications that it might not be exact—are not sufficient to undermine the evidence supporting the jury's finding of Hooks' justifiable reliance. *See id.* Samson's verbal and written representations about the location of the BSM 1 well's bottom hole were made in response to Hooks' inquiry about the

29

exact nature of the BSM 1 pooling unit that Samson sought to create. Samson had also filed the same plat in the Railroad Commission records, thus extending its misrepresentation into the public record. Hooks testified that he agreed to pool based on Samson's misrepresentations regarding the well's bottom hole location and that he would not have consented to the pooling if he had known that the well fell within the buffer zone of his Jefferson County Lease, thereby triggering the offset obligations. The evidence also established that his reliance on Samson's misrepresentation caused him harm, because the royalties he received as part of the BSM 1 unit were much lower than the compensatory royalties he was entitled to under the terms of his Lease. *See O & B Farms, Inc.*, 300 S.W.3d at 421.

Samson argues that it did not know Hooks was relying on the plat in the way he testified—as evidence of the location of the BSM 1 well's bottom hole. However, as discussed above, both Hooks and Samson were aware of the offset obligations in the Jefferson County Lease, and Hooks testified regarding his reasons for seeking additional information before agreeing to pool. Because the record supports the jury's conclusion that Samson's misrepresentation was material to the transaction and made with the intent to induce his reliance upon it, Samson's specific knowledge of the reasons for Hooks' inquiry is irrelevant. *See Exxon Corp.*, 348 S.W.3d at 217 (setting out elements of fraud); *Italian Cowboy Partners,*

*Ltd.*, 341 S.W.3d at 337 (holding that material representation is one which "a reasonable person would attach importance to and would be induced to act on").

Samson also argues that Hooks did not continue to rely on the plat after consenting to the unit and that he had an equal opportunity to discover the truth through "multiple public records." However, intent to induce reliance and justifiable reliance are determined at the time of the alleged fraud. *See Grant Thornton LLP*, 314 S.W.3d at 923 ("In measuring justifiability, we must inquire whether, 'given a fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances *at or before the time of the alleged fraud*[,] it is extremely unlikely that there is actual reliance on the plaintiff's part.'") (emphasis added, brackets in original); *Aquaplex Inc.*, 297 S.W.3d at 775 (holding that party's intent is determined at time that it makes complained-of representation).

Furthermore, the public records themselves were inconsistent. As discussed above, Samson originally filed the March 2000 plat with the Railroad Commission. This plat showed the proposed locations of the BSM 1 well, indicating that the surface drillsite was outside the 1,320-foot buffer zone, but the bottom hole location was planned to fall 1,080 feet from Hooks' Jefferson County Lease. Samson also filed a directional survey, completed in July 2000, showing that the BSM 1 well bottomed 1,184 feet from Hooks' Jefferson County Lease, within the

1,320-foot buffer zone. Samson subsequently reconfigured the BSM 1 pooling unit and filed a new plat, dated November 16, 2000, that incorrectly placed the well's bottom hole at "±1400′ scaled" from the border of Hooks' Jefferson County Lease. This is the same plat that Samson sent to Hooks to procure his consent to pool a portion of his lease into the BSM 1 unit. In light of this conflicting evidence, the jury had the discretion to resolve the conflicts by determining that the public records did not provide Hooks with an equal opportunity to discover the location of the well's bottom hole.

We overrule Samson's challenges to the legal and factual sufficiency of the evidence supporting the jury's findings on Hooks' common-law fraud claim.[5]

---

[5] Samson argues that it had no duty to disclose the location of the well's bottom hole, as a matter of law, and that there was no evidence that is breached such a duty. The existence of a duty to disclose is relevant when a failure to disclose is the basis of a fraud cause of action. *See Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001) (holding that in absence of duty to disclose, failure to disclose generally cannot serve as evidence of fraud). Here, however, Hooks' fraud claim is based on Samson's affirmative misrepresentation. Thus we need not determine whether Samson had a duty to disclose.

Samson also complains that the trial court erred in submitting a failure to disclose instruction to the jury in the question on fraud, but it did not object to the portion of the jury charge instructing the jury that fraud could be based on a failure to disclose. It objected only to the inclusion of the legally correct statement that a party who has already made a representation must also disclose newly acquired information that makes the previous representation untrue or misleading. *See, e.g.*, *Ginn v. NCI Bldg. Sys., Inc.*, 472 S.W.3d 802, 836 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (stating that duty to disclose may arise when one party makes representation, which gives rise to duty to disclose new information that party is aware makes earlier representation misleading or untrue) (citing *Solutioneers Consulting, Ltd. v. Gulf Greyhound Partners, Ltd.*, 237 S.W.3d 379, 385 (Tex. App.—Houston [14th Dist.] 2007, no pet.)). Thus, this argument is unavailing.

### D. Fraud Damages

Samson challenges the legal and factual sufficiency of Hooks' fraud damages evidence.[6]

The jury determined that $20,081,638.01 "would fairly and reasonably compensate [Hooks] for [his] damages, if any, that were proximately caused by" Samson's fraud. The charge instructed the jury to consider the "[l]ost income to [Hooks] that was the natural, probable, and foreseeable consequence of Samson's fraud."

The amount awarded by the jury corresponds to the amount of compensatory royalties, including royalty due on formation production and the associated late charges, due under the terms of the Jefferson County Lease for production from the BSM 1 and DuJay 1 wells. Samson argues that there is insufficient evidence supporting the jury's damages award. Hooks argues that "[u]pon remittitur for the amount not permitted under the Texas Supreme Court opinion, the damages award is factually and legally sound."

#### 1. Proper Measure of Damages

Samson argues that because Hooks "chose to pursue an incorrect measure of damages, there is no evidence of damages" and "[t]he damages testimony is based

---

[6] Samson also argues that the evidence supporting Hooks' statutory fraud claims was legally and factually insufficient. Because the jury's findings regarding Hooks' common-law fraud claim sufficiently support the jury's findings of damages, we need not address these arguments.

on a flawed methodology." Samson argues that, in seeking "lost profits," Hooks "proved only the same damages they would have presented for the breach of oil and gas lease claim they previously lost on summary judgment" and the lost profits are not properly part of an out-of-pocket damages calculation. Samson further complains that Hooks' attempt to categorize his damages as consequential damages is unavailing, as he did not plead for such damages and is not entitled to them. Thus, we first consider the proper measure of damages.

A party may recover actual damages on a successful fraud claim, and, "[a]t common law, actual damages are either 'direct' or 'consequential.'" *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 636 (Tex. 2007) (quoting *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997)). Generally, "Texas recognizes two measures of direct damages for common-law fraud: the out-of-pocket measure and the benefit-of-the bargain measure." *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015) (quoting *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex. 1998)). The former "derive[s] from a restitutionary theory" while the latter "derive[s] from an expectancy theory." *Id.* (citing *Sonnichsen*, 221 S.W.3d at 636). Out-of-pocket damages are measured by the difference between the value expended versus the value received, thus allowing the injured party to recover based on the actual injury suffered. *Id.* (citing *Formosa Plastics*, 960 S.W.2d at 49). Benefit-of-the-bargain

34

damages are measured by the difference between the value as represented and the value received, allowing the injured party to recover profits that would have been made had the bargain been performed as promised. *Id.*

Consequential damages are damages that result naturally but not necessarily from the wrongful act. *Sonnichsen*, 221 S.W.3d at 636; *Arthur Andersen & Co.*, 945 S.W.2d at 816. Consequential damages are recoverable only if the misrepresentation is a producing cause of the loss, i.e. if the losses are foreseeable and directly traceable to and result from the misconduct. *Arthur Andersen & Co.*, 945 S.W.2d at 817; *see Formosa Plastics*, 960 S.W.2d at 49 n.1 ("When properly pleaded and proved, consequential damages that are foreseeable and directly traceable to the fraud and result from it might be recoverable."). And, unlike direct damages, consequential damages may include subsequent losses if those losses were reasonably foreseeable and have the requisite nexus to the wrong. *Arthur Andersen & Co.*, 945 S.W.2d at 817.

Samson argues that the lost-income damages found by the jury, reflecting the compensatory royalties and associated late charges, are a contract measure of damages. However, the fact that Hooks' loss was an economic loss related to the subject matter of his contract with Samson does not prevent his recovery of tort damages. *See Formosa Plastics*, 960 S.W.2d at 47 (holding that "tort damages are not precluded simply because a fraudulent representation causes only an economic

35

loss"). The jury was asked to determine the amount of money that would compensate Hooks for the damages proximately caused by Samson's fraud and was told to consider the "[l]ost income to [Hooks] that was the natural, probable, and foreseeable consequence of Samson's fraud." This is a proper measure of consequential damages, which are recoverable as fraud damages so long as Hooks properly pleaded and proved them. *See Formosa Plastics*, 960 S.W.2d at 49 n.1; *Arthur Andersen & Co.*, 945 S.W.2d at 817.

Samson also argues that Hooks did not properly plead for consequential damages. *See Formosa Plastics*, 960 S.W.2d at 49 n.1. However, as Hooks argues, he pleaded for "damages for injuries that were the proximate result of Samson's fraud," and he specifically pleaded that those damages were "equal to at least the compensatory royalties [Hooks] would have been due under [his] Jefferson County Lease in the absence of any purported pooling." In his sixth amended petition—the first petition including his fraud claim—Hooks alleged that he was "injured as a direct, proximate, natural, and reasonable result of Samson's false representations." He contended that Samson's fraud vitiated the pooling agreement, and thus his interests "were not pooled into the [BSM 1 well and unit,]" but he recognized that "Samson contends otherwise." Hooks alleged that "if Samson is correct that the Hooks Interest[s] were pooled into [the BSM 1 well and unit], [he] [is] entitled to damages equal to at least the difference between the value of that with which [he]

36

parted, and the value [he] actually received, as a result of Samson's false representations. Such damages would equal at least the compensatory royalties [he] would have been due under [his] Jefferson County Lease in the absence of any purposed pooling. . . ." Hooks maintained these claims throughout trial. Thus, the pleadings adequately put Samson on notice of the damages being sought by Hooks. *See Horizon CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 897 (Tex. 2000) (discussing fair notice rule).

Samson further argues that Hooks "could not seek compensatory damages" unless he sought to set aside his consent to pool a portion of his Jefferson County Lease into the BSM 1 unit. Samson cites *Fortune Production Co. v. Conoco, Inc.*, 52 S.W.3d 671 (Tex. 2000), to support its contention that Hooks "could stand on the bargain and recover fraud damages, or [he] could seek rescission of the consent to pool" but he "could not do both." *Fortune Production* does not support Samson's argument. In that case, the supreme court stated that "there may be circumstances under which a party who was induced to enter a contract by fraud may ratify that contract in such a manner that a claim for damages is foreclosed," and it held that the evidence of ratification in that case was legally sufficient to foreclose some portion of the plaintiffs' claims for damages. *Id.* at 676. Here, by contrast, Hooks did not ratify the BSM 1 pooling agreement. Instead, Hooks filed his fraud claim upon learning of Samson's misrepresentation, thus demonstrating

his intent to pursue fraud damages rather than to ratify or to rescind the fraudulently induced agreement. *See id.* at 676–77.

## 2. *Sufficiency of the Evidence of the Amount of Damages*

We turn next to the legal and factual sufficiency of the evidence supporting the jury's award of fraud damages totaling $20,081,638.01. The evidence at trial indicated that Samson's drilling of the BSM 1 well triggered the offset obligations in the Jefferson County Lease. Samson neither drilled an offset well nor released Hooks' lease within ninety days of first production from this well, which left only the remedy of payment of compensatory royalties. *See Hooks*, 457 S.W.3d at 68 (addressing question of whether, "because the contract gave Samson alternatives that were not recurring, Samson may prevent Hooks from suing based on the one recurring obligation"). However, Samson never paid these compensatory royalties because it fraudulently induced Hooks into pooling a portion of his Jefferson County Lease into the BSM 1 unit and subsequently paid him the lower royalties due under the terms of that deal.

Hooks testified that Samson did not make any fraudulent misrepresentations to him specifically regarding the DuJay 1 well. However, he presented evidence that Samson drilled the DuJay 1 well within the buffer zone of its Jefferson County Lease, also triggering offset obligations under the terms of the lease. However, Hooks' damages expert, Charles Graham, testified that Samson's fraud in

38

procuring Hooks' agreement to pool his lease into the BSM 1 unit led Hooks to believe that the offset obligations as to the DuJay 1 well were met by the BSM 1 well.

Hooks presented Graham's testimony and other evidence of the amount of the compensatory royalties and late charges he would have received under the terms of the Lease. He also provided evidence of the amount of royalties Samson paid under the fraudulently procured consent to pool. Graham testified that his opinion was based on the language of Hooks' Jefferson County Lease as applied to Samson's production and sales from the relevant wells. He stated that damages that resulted from Samson's misleading Hooks into agreeing to pool his Jefferson County Lease into the BSM 1 unit included the compensatory royalties that would have been due under the Lease's offset obligations, which included $3,553,200.15 in unpaid compensatory royalties for production from the BSM 1 well and $3,112,015.22 in unpaid compensatory royalties for production from the DuJay 1 well. He also testified that Samson's fraud resulted in Hooks' losing $930,918.65 in unpaid royalties for formation production and $12,995,832.05 in late charges for unpaid royalties. Finally, Graham testified that Samson should be credited with $510,328.01 for royalties that it paid pursuant to the fraudulently obtained pooling agreement.

### *a. DuJay 1 well damages*

Samson argues that "[e]ven if consequential damages were permitted, 'lost profits' based on the DuJay 1 well are not recoverable." Samson argues that Hooks admitted he was not defrauded as to the DuJay 1 well but "[a]pproximately half" of his claim fraud damages were attributable to that well. Furthermore, "to the extent [Hooks sought] compensatory royalty damages for the DuJay 1 well," there was no evidence, or insufficient evidence, supporting that claim.

The evidence demonstrated that Samson completed the DuJay 1 well within the buffer zone of Hooks' Jefferson County Lease, which, like the BSM 1 well, would have triggered the offset obligations. However, the DuJay 1 well was "offset" by the BSM 1 well. Graham testified that, by fraudulently obtaining Hooks' consent to pool into the BSM 1 unit, Samson likewise prevented him from seeking proper protection of his rights under the terms of the Lease with regard to the DuJay 1 well. Thus, the evidence indicates that a separate misrepresentation as to the DuJay 1 well was not required because Samson's fraud as to the BSM 1 well necessarily implicated Hooks' rights as to the DuJay 1 well.

Samson argues that Hooks did not establish cause-in-fact and foreseeability as to damages for the DuJay 1 well as required to recover consequential damages. It argues that it drilled the DuJay 1 well after Hooks agreed to pool his lease into the BSM 1 unit, and, thus, Hooks would have to prove that "Samson would have

40

drilled the DuJay 1 well (1) even if [Hooks] had not agreed to pool; (2) within 1320 feet of [Hooks' tract]; and (3) [had] not released Hooks' tract to address offset issues." We disagree that Hooks must prove that Samson would have drilled the DuJay 1 well absent the fraudulently induced pooling agreement. Fraud vitiates whatever it touches. *See Hooks*, 457 S.W.3d at 57 (quoting *Borderlon*, 661 S.W.2d at 909). We have already upheld the jury's determination that Samson obtained Hooks' consent to pool through fraud, and Hooks need not prove what Samson's conduct might have been if it had not committed fraud. And the evidence did establish that Samson drilled the DuJay 1 well within 1,320 feet of Hooks' Jefferson County Lease and that Samson did not release Hooks' tract.

Thus, the evidence is legally and factually sufficient to support the award of fraud damages based on the amount of compensatory royalties—totaling $6,665,215.37 less a credit for the $510,328.01 in royalties Samson paid pursuant to the fraudulently obtained pooling agreement—that would have been due to Hooks on the BSM 1 and DuJay 1 wells. These amounts were likewise foreseeable and directly traceable to and resulted from Samson's misconduct. *See Arthur Andersen*, 945 S.W.2d at 816–17; *see Formosa Plastics*, 960 S.W.2d at 49 n.1.

### b. Contractual late charges as fraud damages

Samson also argues that two-thirds of the fraud damages—the amount represented by the late charges due on unpaid royalties under the terms of Hooks'

41

Jefferson County Lease—"are not actual damages at all," "are not proper out-of-pocket damages," and constitute an improper basis for calculating Hooks' fraud damages. Samson asserts that the "'late charge' damages are another way in which [Hooks is] attempting to convert [his] barred contract case into fraud damages."

We have already overruled Samson's argument that Hooks was required to prove out-of-pocket damages to recover for Samson's fraud. Consequential damages are a type of actual damages that are available in fraud cases. *See Sonnichsen*, 221 S.W.3d at 636 (actual damages include both direct and consequential damages; in fraud cases, out-of-pocket and benefit-of-the-bargain are measures of direct damages while consequential damages result naturally but not necessarily from wrongful act). We have also rejected Samson's argument that the lost-income damages found by the jury, reflecting the compensatory royalties and associated late charges, are barred solely because they could also serve as a measure of damages for breach of contract. The fact that Hooks' loss was an economic loss related to the subject matter of his contract with Samson does not prevent his recovery of tort damages. *See Formosa Plastics*, 960 S.W.2d at 47 (holding that "tort damages are not precluded simply because a fraudulent representation causes only an economic loss").

We must then consider whether the amount of fraud damages attributable to the late charges on the unpaid compensatory royalties that Hooks should have

received were, as the jury was asked to determine, "[l]ost income to the Hooks that was the natural, probable, and foreseeable consequence of Samson's fraud."

Graham testified that, as a result of Samson's fraud, it failed to pay all of the royalties due to Hooks. He testified that this failure likewise deprived Hooks of $12,995,832.05 in late charges that Samson would have incurred on the unpaid compensatory royalties under the terms of the lease. The terms of the Lease itself, which was likewise in evidence at trial, provided for the payment of the late charges, and Graham testified that he calculated the amount due based on the terms of the Lease. Samson could have foreseen that its fraud prevented Hooks from seeking the compensatory royalties to which he was entitled and that its failure to pay those amounts would invoke its obligation—duly agreed to in the Lease—to pay late charges. Samson does not provide any argument or evidence contradicting this testimony of Graham or otherwise argue that these late charges were not a natural, probable, or foreseeable consequence of its wrongful act.

Samson also argues, in part, that "[w]ith a fraud claim, the aggrieved party can seek prejudgment interest, not 'late charges.'" However, Hooks did not seek prejudgment interest and the final judgment did not award any prejudgment interest. Rather, the trial court entered judgment based on the jury's determination that unpaid compensatory royalties and late charges were the actual, consequential

43

damages that flowed from Samson's fraud. Thus, we need not address the question of prejudgment interest.

The jury's conclusion that the late charges, like the compensatory royalties, were foreseeable and directly traceable to and resulted from Samson's misconduct is supported by legally and factually sufficient evidence. *See Arthur Andersen*, 945 S.W.2d at 816–17; *see Formosa Plastics*, 960 S.W.2d at 49 n.1.

### *c. Formation production damages & remittitur*

Samson argues that we must reverse the award of fraud damages in part based on the fact that the fraud damages originally awarded by the jury included formation production damages. The supreme court affirmed our reversal of that portion of the damages and rendered judgment that Hooks was not entitled to formation production damages. *See Hooks*, 457 S.W.3d at 65.

The $20,081,638.07 awarded by the jury as fraud damages was based in part on Hooks' evidence that he was entitled to unpaid royalty on "formation production" from the BSM 1 well totaling $504,368.64 and unpaid royalty on formation production from the DuJay 1 well totaling $426,550.01. However, this portion of Hooks' evidence on fraud damages may no longer be considered to support the jury's award as a matter of law. *See id.* at 64–65 (holding that Hooks was not entitled to royalty payments for formation production).

44

Hooks contends that this Court could suggest a remittitur that would reduce the amount of fraud damages by $504,368.64 and $426,550.01, as the amounts reflecting the damages based on formation production, and by $1,689,556.85 for the late charges associated with those royalties. *See* TEX. R. APP. P. 46.3 (providing that appellate court may suggest remittitur). If part of a damage verdict lacks sufficient evidentiary support, the proper course is to suggest a remittitur of that part of the verdict, giving the party prevailing in the trial court the option of accepting the remittitur or having the case remanded for a new trial. *See Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 124 (Tex. 2009) ("[W]hen there is some evidence of damages, but not enough to support the full amount, it is inappropriate to render judgment."); *Samuels v. Nasir*, 445 S.W.3d 886, 894 (Tex. App.—El Paso 2014, no pet.) (Rule 46.3 permits Court to suggest remittitur when "appellant complains there is insufficient evidence to support an award and the court of appeals agrees, but concludes there is sufficient evidence to support a lesser award").

As set out above, the record contains some evidence that fraud damages existed, but it did not support the full amount awarded by the trial court. *See ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 877–78, 880 (Tex. 2010) (holding that evidence was legally insufficient to support amount of lost profit damages awarded by trial court, but that there was "legally sufficient evidence to

45

prove a lesser, ascertainable amount of lost profits with reasonable certainty," and remanding case to court of appeals to consider suggestion of remittitur); *Aquaplex, Inc.*, 297 S.W.3d at 777 (holding, in fraud case, that some evidence supported award of fraud damages, but not at level awarded by trial court, and remanding to court of appeals to determine whether to remand for new trial on damages or suggest remittitur). However, the evidence does allow us to determine a lesser award, namely, one that does not include the formation production damages described in Graham's testimony. We conclude that the part of the jury's verdict on fraud damages that was based on formation production damages now lacks sufficient support, and we suggest a remittitur of $2,620,475.50 representing the formation production damages and their associated late charges that are no longer justified in this case.

Samson also argues that the post-judgment interest rate should be 5%. The trial court granted Hooks post-judgment interest on all of the damages awarded in the final judgment at a rate of 18%. In its original briefing, Samson challenged the trial court's post-judgment interest rate. This Court agreed and determined that a 5% interest rate applied to Hooks' recovery for ad valorem taxes—the only award that we left in place. *See Samson Lone Star, Ltd. P'ship*, 389 S.W.3d at 439. The supreme court held, however, "[T]o the extent Hooks recovers for past due royalties, he is entitled to an 18% interest rate. For other recoveries, the statutory

rate of 5% applies because Hooks has not directed us to any portion of the leases providing otherwise." *Hooks*, 457 S.W.3d at 69–70. Based on this language, we conclude that Samson is correct that the 5% post-judgment interest rate applies to Hooks' award of damages for fraud. If Hooks agrees to the remittitur that we suggest below, we will modify the judgment to reflect the remittitur and the proper interest rate. If Hooks does not agree to the remittitur, we will remand the case for a new trial on fraud and thus will not need to reform the judgment's post-judgment interest rate. *See* TEX. R. APP. P. 44.1(b) ("The court may not order a separate trial solely on unliquidated damages if liability is contested.").

Thus, we overrule Samson's issues complaining of the jury's fraud findings. Regarding its complaints on damages, if Hooks agrees to the remittitur, we will reform and affirm the judgment accordingly; however, if Hooks does not accept the remittitur, we will reverse the judgment and remand for a new trial. *See* TEX. R. APP. P. 46.3; *Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 299 S.W.3d at 124.

## Most Favored Nations Clause

Hooks asserted, in a motion for summary judgment, that Samson breached the "most favored nations" clause contained in his Leases, which provided that, under certain circumstances, the royalties payable to Hooks must be elevated to match the highest royalty payable to Samson's other lessors. The trial court granted summary judgment in Hooks' favor, holding that this clause was triggered by

royalty Samson paid under a pooling agreement to the State of Texas that was higher than the royalty due to Hooks.

We originally determined that Hooks was not entitled to damages for his claim that Samson breached the most-favored-nations clause. *See Samson Lone Star, Ltd. P'ship*, 389 S.W.3d at 437. The supreme court reversed, holding that Hooks was entitled to an increased royalty rate of 28.28896%. *See Hooks*, 457 S.W.3d at 63.

Samson argues that we must reverse and remand on this issue because "the favored nations damages wrongly include formation production damages." However, the damages awarded in the trial court's judgment were based on a stipulation that set out most-favored-nations damages with and without amounts for formation production. Specifically, Samson stipulated to $431,450.71 in damages for breach of the most-favored-nations clause not including royalty for formation production. Accordingly, we may modify the judgment to reflect the amount of damages without formation production royalties based on the parties' stipulation.

Regarding the post-judgment interest rate,[7] the supreme court held that Hooks is entitled to an 18% interest rate "to the extent [he] recovers for past due

---

[7] Samson actually argues that the "prejudgment" interest rate was improper. However, the trial court's judgment did not award prejudgment interest, and the supreme court's opinion on this issue addressed the post-judgment interest rate.

royalties," such as here, where the award constitutes higher royalties that Samson owed Hooks but never paid. *See id.* at 69–70. Thus, Samson's argument that interest needs to be recalculated is unavailing. The 18% post-judgment interest rate applies to the most-favored-nations damages.

We overrule Samson's issues regarding the most-favored-nation damages.

## II. HOOKS' APPEAL ON REMAND

## Background

### A. *Hooks' Breach of Lease Claims for Hardin County Leases*

Hooks' cross-appeal concerns his claim that Samson breached its offset obligations with regard to Hooks' two Hardin County Leases. The Hardin County Leases, like the Jefferson County Lease, contained an offset obligation provision. That provision specifically stated that if a gas well were completed within 1,320 feet from the leased premises, then, within ninety days from the date of the sale of first production from that well, Samson must take one of three actions: (1) commence due diligence operations for drilling an offset well to protect against drainage; (2) pay Hooks "compensatory royalties"—in addition to any royalties currently due—in a sum equal to the royalties that would be payable under the Lease on the production from the adjacent or nearby producing well as if it had been producing on the leased premises; or (3) release the offset acreage.

---

*See Hooks*, 457 S.W.3d at 69–70. Thus, we construe this argument as a complaint regarding the post-judgment interest rate.

49

Both Hardin County Leases also provided for pooling in terms that were essentially the same with respect to the manner and methods of pooling. The leases called for an instrument "identifying and describing the pooled acreage" and stating that a "pooled unit shall become effective on the date such instrument or instruments are so filed for record." The pooling provision in each Lease also stated that "[o]perations for drilling on or production of gas from any part of the pooled unit . . . , regardless of whether such operations for drilling were commenced or such production was secured before or after the date of this lease or the date of the instrument designating the pooled unit, shall be considered as operations for drilling on or production of gas from the Leased Premises" and that "the entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease." The parties stipulated at trial that Hooks had owned his interests in the units at issue since the date of first production in each unit.

In February 2001, Samson completed the Black Stone Minerals A-1 well ("BSM A-1 well") in Hardin County. On March 21, 2001, Samson filed a Unit Designation for a 704-acre unit called the Black Stone Minerals "A" No. 1 Gas Unit ("BSM A-1 unit"), which unitized the lease where the BSM A-1 well was located with Hooks' two Hardin County Leases and other tracts, including leases owned by the State. The designation reflected that it was effective as of first

production and included a list of the leases pooled, including Hooks' Hardin County Leases. The designation for the BSM A-1 unit included gas production at all depths between 6,000 and 13,000 feet (including what Hooks refers to as the deeper "Doyle formation" and what he refers to as the more shallow "EY-5 formation"), although the BSM A-1 well produced gas only from the shallow EY-5 formation.

In June 2001, the BSM A-1 well began producing. In December 2001, Samson finished the DuJay 1 well, which produced from some of the same land designated to the BSM A-1 unit but at a lower horizon than the BSM A-1 well. The DuJay 1 well began producing in January 2002.

In February 2002, Samson amended the BSM A-1 unit designation. It executed and recorded a designation for a new unit, the Joyce DuJay No. 1 Gas Unit ("DuJay 1 unit") that cited an effective date as of first production of the DuJay 1 well, i.e., January 2002. The DuJay 1 unit designated a 571-acre unit with a different name, different leases, different depths, and different boundaries from the BSM A-1 unit.

Subsequently, Samson drilled another DuJay well ("DuJay A-1 well") and created a separate pooled unit for that well. The DuJay A-1 unit differed from the DuJay 1 unit by depth limitation and acreage. The DuJay A-1 well began producing on September 25, 2002, but Samson did not file the DuJay A-1 unit

designation until July 2003. Hooks' Hardin County Leases were likewise pooled into the designated DuJay A-1 unit.

However, the BSM 1 well and the BSM A-1 well both continued producing in close proximity to the DuJay 1 and DuJay A-1 units—in fact, within 1,320 feet of the borders of those units.

## B.    *Procedural History*

Before trial, Hooks and Samson filed cross-motions for summary judgment on the issue of whether Samson breached the offset obligations in the Hardin County Leases. Hooks argued that the plain language of the Leases and the undisputed facts established as a matter of law that Samson was liable for the BSM 1 well's encroachment on the DuJay 1 unit and for the BSM A-1 well's encroachment on the DuJay A-1 unit, triggering offset obligations under the terms of the Leases and requiring payment of compensatory royalties.

The trial court granted Samson's motion and denied Hooks' motion on this issue without stating its reasons.

Hooks filed a cross-appeal, claiming that the trial court erred in granting Samson's motion for summary judgment and denying his own. Hooks included in this issue sub-issues regarding the correct interpretation of Samson's offset obligations and other provisions in the Jefferson County Lease and Hardin County Leases and the statute of limitations. Samson contended that Hooks waived his

appeal of the summary judgments, and it argued that the trial court correctly interpreted the Hardin County Leases with respect to the issues raised by Hooks on cross-appeal and correctly rendered summary judgment. We originally affirmed the trial court's summary judgment on this issue, holding that Hooks' claims were barred by the statute of limitations. *Samson Lone Star, Ltd. P'ship*, 389 S.W.3d at 440. The Texas Supreme Court determined that Hooks had preserved this issue for consideration on appeal, reversed our limitations holding, and remanded to this Court for consideration of the merits of Hooks' claim for breach of the offset provisions and the proper construction of the entire-acreage clause. *Hooks*, 457 S.W.3d at 67, 69. It held that, assuming Samson breached, Hooks could be "entitled to damages for royalties owed within four years of filing suit." *Id.* at 68–69.

## Breach of Lease

Hooks argues that he conclusively established that Samson is liable for compensatory royalties for production from the BSM 1 and BSM A-1 wells.

### A.    *Standard of Review*

A party moving for Rule 166a(c) summary judgment must conclusively prove all of the elements of its cause of action as a matter of law. TEX. R. CIV. P. 166a(c); *Holy Cross Church of God in Christ v. Wolf*, 44 S.W.3d 562, 566 (Tex. 2001); *Rhone-Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 222–23 (Tex. 1999). A

defendant moving for summary judgment on a cause of action asserted against it must negate as a matter of law at least one element of the plaintiff's theory of recovery or plead and prove each element of an affirmative defense. *Nelson v. Chaney*, 193 S.W.3d 161, 165 (Tex. App.—Houston [1st Dist.] 2006, no pet.).

"When both sides move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both sides' summary judgment evidence and determine all questions presented." *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *accord Gillebaard v. Bayview Acres Ass'n*, 263 S.W.3d 342, 348 (Tex. App.—Houston [1st Dist.] 2007, pet. denied). The reviewing court should render the judgment that the trial court should have rendered. *See Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004); *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997); *see also Gillebaard*, 263 S.W.3d at 347–48. The propriety of summary judgment is a question of law. We therefore review the trial court's ruling to grant one party's motion and deny the other using the de novo standard. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003).

"In construing contracts, we must ascertain and give effect to the parties' intentions as expressed in the document." *Hooks*, 457 S.W.3d at 63 (citing *Lopez v. Muñoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000)). We attempt to

harmonize all contractual provisions by "analyzing the provisions with reference to the whole agreement." *Id.* (citing *Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curiam)). We "construe contracts from a utilitarian standpoint bearing in mind the particular business activity sought to be served," and, when possible and proper, we avoid a "construction which is unreasonable, inequitable, and oppressive." *Id.* (citing *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)). If, through the use of relevant rules of construction, the contract can be given a definite meaning, we construe it as a matter of law. *Id.* at 63–64.

### B.    *Analysis*

In his motion for summary judgment and on appeal, Hooks argues that a portion of the pooling provision, which he refers to as the "entire acreage clause," applies here to mean that the Hardin County Leases "expressly and plainly include pooled acreage as part of the acreage of the leases." Hooks further argues that, because the pooled acreage is part of the lease, any producing gas well completed within the 1,320-foot buffer zone of the unit triggered the Leases' offset obligations. Hooks thus argues that both the BSM 1 and the BSM A-1 wells produced gas from within 1,320 feet of the units into which its Hardin County Leases had been pooled and that Samson did not release Hooks' acreage, drill an offset well to protect against drainage, or pay compensatory royalties as required

by the offset obligation provisions in the Hardin County Leases, thus breaching those Leases.

Samson urges a narrower interpretation of the entire acreage clause and asserts that the offset obligations are not triggered by wells within 1,320 feet of a unit boundary but only by wells within 1,320 feet of an unpooled lease boundary.[8] It relies on language in the offset obligation clauses that recognize a distinction between the "leased premises" and "acreage pooled therewith."

Our analysis of this issue requires that we construe the meaning and legal effect of the pooling provision in the Hardin County Leases, which states, in relevant part:

> Lessee, at its option, is hereby given the right and power in its discretion to pool or combine, as to any one or more formations, the land covered by this Lease or any portion of said land, insofar only as gas or gas condensate rights are concerned . . . , with other land, lease or leases in the immediate vicinity thereof, except to the extent and in the manner hereinafter stipulated. With respect to any such unit so formed, Lessee shall execute in writing an instrument or instruments identifying and describing the pooled acreage, and file same for recording in the office of the County Clerk in Hardin County, Texas, and the pooled unit shall become effective on the date such instrument or instruments are so filed for record. . . .
>     Operations for drilling on or production of gas from any part of the pooled unit which includes all or a portion of the Leased Premises,

---

[8]  Samson also argues that no offset obligations arose even if we apply Hooks' lease interpretation and that Hooks did not conclusively establish that it breached any offset obligations that arose. Samson likewise contends that it met the offset obligations by drilling offset wells. However, under our construction of the Leases, the offset obligation in the Hardin County Leases was not triggered, and we need not address this contention.

regardless of whether such operations for drilling were commenced or such production was secured before or after the date of this lease or the date of the instrument designating the pooled unit, shall be considered as operations for drilling on or production of gas from the Leased Premises, whether or not the well or wells be located on the Leased Premises, and the entire acreage constituting such unit or units shall be treated for all purposes, except the payment of royalties on production from the pooled unit, as if the same were included in this Lease. The above right and power to pool may be exercised at any time and from time to time and before or after a well has been drilled, or while a well is being drilled. Lessee may vacate any unit formed by it hereunder. . . . The pooling for gas hereunder by Lessee shall also pool and unitize all liquid gas, and the royalty interest payable to Lessor thereon shall be computed the same as on gas. For the purpose of computing the royalties to which owners of royalties shall be entitled on production from each production unit, there shall be allocated to the applicable separate tract acreage included in such production unit a pro rata portion of the production produced from such production unit. . . .

This pooling provision is substantially similar to pooling provisions that have been used in gas leases in this State since at least the 1950s. *See, e.g.*, *Mengden v. Peninsula Prod. Co.*, 544 S.W.2d 643, 644 (Tex. 1976); *Skelly Oil Co. v. Harris*, 352 S.W.2d 950, 954 (Tex. 1962); *Tiller v. Fields*, 301 S.W.2d 185, 187 (Tex. Civ. App.—Texarkana 1957, no writ).

The primary legal consequence of such a pooling provision is settled in Texas law as being "that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." *Se. Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999) (citing *Southland Royalty Co. v. Humble Oil & Ref. Co.*, 249 S.W.2d 914, 916 (Tex. 1952)); *Chesapeake Expl.,*

57

*L.L.C. v. Energen Res. Corp.*, 445 S.W.3d 878, 884 (Tex. App.—El Paso 2014, no pet.). Other consequences of pooling under a provision such as the one at issue here have likewise been "fully discussed" by the Texas Supreme Court. *See Mengden*, 544 S.W.2d at 647 (construing pooling provision that is substantively identical to provision at issue here and stating that "the other normal consequences of pooling" were "fully discussed by this Court" in *Southland Royalty Co.*). In *Southland Royalty Co.*, the supreme court stated that the consequences of pooling are that:

> the life of the lease is extended as to all included tracts beyond the primary term and for as long as oil, gas or other minerals are produced from any one of the tracts included in the lease; the commencement of a well on any one of the tracts operates to excuse the payment of delay rentals on all included tracts for the period stated in the lease; production from a well on any one of the tracts relieves the obligation to pay delay rentals, during production, on all included tracts; the lessee is relieved of the usual obligation of an implied covenant for reasonable development of each tract separately; wells may be located without reference to property lines; [and] the lessee is relieved of the obligation to drill offset wells on other included tracts to prevent drainage by a well on one or more of such tracts.

249 S.W.2d at 916.

Hooks urges that "[t]he 'for all purposes' language in the 'entire acreage' clause is all-encompassing and subject to only one limitation not at issue here" and that the "broad language means that, once the leased acreage is pooled, all the acreage in the pooled unit is treated as if it were part of the lease." Specifically, Hooks urges this Court to conclude that "once the lease is pooled, the 1,320 foot

58

protected zone [set out in the offset obligation provision of the Leases] is no longer based on only the originally leased tract" and the "protected zone is measured from the boundary of the unit into which the leased tract is pooled."

Neither the language of Hooks' Hardin County Leases nor the precedent of Texas courts construing the effect of a pooling provision supports such an interpretation. The language in the Hardin County Leases' pooling provision— including the sentence that Hooks refers to as the "entire acreage" clause—is standard language. This language has been construed by Texas courts as serving to effectuate an oil and gas lessee's ability to pool leases for purposes of preventing waste in the development of mineral leases by providing that "production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit." *See Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014) (quoting *Tichacek*, 997 S.W.2d at 170); *see also Mengden*, 544 S.W.2d at 647 (stating that language in pooling paragraph in leases substantially identical to Hooks' Hardin County Leases' provision details "the other normal consequences of pooling" and "were fully discussed by this Court in [*Southland Royalty Co.*]"); *Southland Royalty Co.*, 249 S.W.2d at 916 (setting out normal consequences of pooling).

No court has construed the decision to pool under this type of pooling provision as extending terms specifically agreed to for the protection of an

individual lessor, like Hooks, to an entire pooled unit, and we decline to do so. We

observe that the offset obligation provision that Hooks argues Samson breached

provides:

> Lessee covenants and agrees to operate the leased premises as a reasonable and prudent operator would under the same or similar circumstances and *to protect each of the leased premises from drainage* by reason of any well drilled on adjacent or nearby lands. The above covenant notwithstanding, in the event . . . a well producing from a unit not comprised of acreage from the leased premises which has been classified as "gas" . . . is completed on adjacent or nearby lands *not more than one thousand three hundred and twenty feet (1,320') from the leased premises . . .*, Lessee covenants to, within ninety days from the date production is first sold, removed or otherwise marketed . . ., either to (1) commence with due diligence operations for the actual drilling of an offset well on the leased premises to the base of the formation from which the adjacent or nearby producing well is producing, (2) pay compensatory royalties . . ., or (3) . . . release by recordable instrument the offset acreage. . . . Notwithstanding anything herein to the contrary, Lessee shall have no obligations under this Article . . . in the event a producing well on nearby or adjacent land is already offset by a well *on the leased premises or on acreage pooled therewith* producing from the same producing horizon from which production has been secured from any well on nearby or adjacent lands.

(Emphasis added).

The language of the offset obligation expressly states that its purpose is to

protect Hooks' Hardin County Leases from drainage. Nothing in the Leases'

pooling provision evinces a specific agreement to broaden the protection provided

by the offset obligation to include other leases not owned by Hooks.[9] *See Hegar*, 435 S.W.3d at 798 (identifying pooling provision substantially identical to Hooks' and stating that primary legal consequence of pooling is that "production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit") (quoting *Tichacek*, 997 S.W.2d at 170); *Southland Royalty Co.*, 249 S.W.2d at 916 (outlining legal consequences of pooling "in the absence of express agreement to the contrary" as essentially providing that production of oil or gas from wells located on any tract in pooled unit as production from each and all other tracts included in unit). Rather, the offset obligation provision specifically references the "leased premises"—referring to Hooks' tract of land—and makes a distinction between the leased premises and larger pooled units in which those premises might be included.

Reading the relevant provisions with reference to the whole agreement and construing the lease "from a utilitarian standpoint bearing in mind the particular business activity sought to be served," as we must, we determine that the "entire acreage clause" included in the pooling provision was intended to effectuate and set out the details of Samson's pooling authority, not to extend the applicability of

---

[9]    We observe that Samson would still have an implied duty to protect the unit from drainage, *see Southeast Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999), but Hooks is not asserting a claim for actual draining of his Hardin County Leases. Rather, he is arguing that Samson breached the terms of his Hardin County Leases.

the offset obligations. *See Hooks*, 457 S.W.3d at 63 (providing rules of contract construction); *Mengden*, 544 S.W.2d at 647 (stating that language in pooling paragraph in leases, including language that Hooks relies on here, details "the other normal consequences of pooling").

Hooks argues that construing the pooling provision as providing that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit "gives meaning only the first part of the provision in which the 'entire acreage' clause appears" and renders useless the portion of the pooling provision that states "and the entire unit acreage constituting [the unit] shall be treated for all purposes . . . as if the same were included in this Lease." We disagree.

In *Mengden*, the Texas Supreme Court construed an essentially identical pooling provision that also included a statement that:

> [o]perations for drilling on or production of oil or gas from any part of the pooled unit which includes all or a portion of the land covered by this lease . . . shall be considered as operations for drilling on or production of oil or gas from land covered by this lease [w]hether or not the well or wells be located on the premises covered by this lease, and the entire acreage constituting such unit or units . . . shall be treated [f]or all purposes, except the payment of royalties on production from the pooled unit, [a]s if the same were included in this lease.

544 S.W.2d at 644. The supreme court stated that the pooling provision gave Mengden, the operator's assignee who formed the gas units, the authority to form

62

the relevant gas units, thereby perpetuating the portions of the "B" lease included in the relevant units even though the wells were located on the "A" lease portion of the unit. *Id.* at 647. It further stated that the language in the pooling provision "detailed" the "other normal consequences" of pooling. *Id.* We conclude, like the court in *Mengden*, that, far from being rendered useless, the sentence relied upon by Hooks is part of the pooling provision and is intended to detail the normal consequences of pooling. Hooks has provided no argument or citation to authority for why this Court should be the first to isolate that particular phrase from the standard pooling language and give it the novel reading he suggests.

Hooks also argues that *Skelly Oil Co. v. Harris* and *Tichacek*, which we cite in our analysis construing the pooling provision, support his construction. Again, we disagree. In *Skelly Oil*, the lessors sued for termination of an oil and gas lease, and the supreme court held that the lease was kept in force by production of a well on land with which part of the leased premises was pooled. 352 S.W.2d at 950–51. The lessees argued that the lease had terminated because "the well was not drilled on the land described in the lease but on acreage pooled therewith," and they asserted that "the pooling clause declares that production from pooled acreage shall be treated as if production is had from the lease but does not state in so many words that drilling operations on pooled acreage shall have the same effect as operations conducted on land described in the lease." *Id.* at 953. The supreme court

63

discussed a substantively similar pooling provision to the one at issue here and stated:

> The second sentence of Paragraph 4 states plainly and unequivocally that except with respect to the payment of royalties on production, the entire acreage pooled into a unit shall be treated for all purposes as if it were included in the lease. Having excepted the matter of royalty payments on production from this sweeping declaration, the parties then dealt specifically with the legal consequences of production from a pooled unit and the royalties which the lessor would be entitled to receive therefrom. It seems clear to us that these provisions were not intended to limit the scope and effect of the second sentence in the paragraph as contended by respondents. From a consideration of the entire lease, the terms of the 60-day clause, and the other provisions of Paragraph 6, it is our opinion that drilling in progress at the end of the primary term on pooled acreage has the same legal effect as similar operations conducted on land described in the lease.

*Id.* at 954.

Thus, although, as Hooks argues, the supreme court "rejected an argument that would restrict the scope of the entire acreage clause's 'all purpose' language" and referred to that language as "a sweeping declaration" that excepts only the payment of royalties, the effect of the *Skelly Oil* court's holding was consistent with the legal consequences of pooling recognized in cases dating back at least to *Southland Royalty Co.* That case held that the usual consequences of pooling were to extend the life of the lease "as to all included tracts beyond the primary term and for as long as oil, gas, or other minerals are produced from any one of the tracts included in the lease" and to relieve the lessee "of the usual obligation of an implied covenant for reasonable development of each tract separately" and "the

obligation to drill off-set wells on other included tracts to prevent drainage by a well on one or more of such tracts." *See Southland Royalty Co.*, 249 S.W.2d at 916. Nothing in *Skelly Oil* indicates an intention to depart from this traditional application of the pooling provision as Hooks urges us to do here.

Likewise, in *Tichacek*, the supreme court recognized again that the "primary legal consequence of pooling" is that production and operations anywhere on the pooled unit are treated as if they have taken place on each tract or individual lease within the unit. 997 S.W.2d at 170 (citing *Southland Royalty Co.*, 249 S.W.2d at 916). It applied this legal construction to conclude that when a lessee pools in good faith, it is relieved of the obligation to reasonably develop each tract separately or to drill off-set wells on other tracts included in the unit to prevent drainage. *Id.* The *Tichacek* court held, then, that because the jury in that case affirmed the validity of the pooling, the plaintiffs had to segregate the claims between pre-pooling drainage from the leases and post-pooling drainage from the unit. *Id.* at 170–71. *Tichacek* did not stand for the proposition that a lessor like Hooks may sue the lessee for breach of lease based on an expanded reading of the lessee's obligation to drill offset wells to protect an individual lease from drainage; it stated only that the lessee has a duty to protect the unit from drainage. Thus, *Tichacek* addressed a claim arising from drainage—a claim that Hooks does not assert here. Furthermore, in *Tichacek* and more recent cases, the supreme court has interpreted

pooling clauses more narrowly than in *Skelly Oil*, and it relied on the language used by the parties in construing the relevant provisions. *See id.* at 170; *see also Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005) (same).

The court's ultimate conclusion in *Mengden* is instructive here. The question before the supreme court was whether the pooling of two leases extended a payout provision and a partial reversion contained in a farmout agreement[10] applicable to only one of the pooled leases to the production from the entire unit. *See Mengden*, 544 S.W.2d at 644, 647–48. The court concluded that, because the leases were properly pooled, "the total unit production and costs should be allocated to each lease in proportion to the number of acres contributed therefrom to the respective units" and it "found no provision in the farmout agreement or assignments to [the defendant] which would prevent or alter the normal rights and effects of the pooling provision of the leases." *Id.* at 647. Specifically, the supreme court reasoned that the farmout agreements applicable to the "A" and "B" leases contained different method of calculating Mengden's payout and the effective date of Peninsula Production's reversion interest in the leases and that the expenses on

---

[10]     A farmout agreement is "a 'very common form of agreement . . . whereby the owner of a lease not desirous of drilling at the time agrees to assign the lease, or some portion of it . . . to another operator who is desirous of drilling the tract.'" *Mengden v. Peninsula Prod. Co.*, 544 S.W.2d 643, 645 n.1 (Tex. 1976) (quoting Williams & Meyers, OIL & GAS LAW, MANUAL OF TERMS 167 (1971)).

lease "B" "have amounted to considerably more than" the amounts that were recoverable on lease "A." *Id.* at 648. The supreme court concluded:

> If the producing wells had been located on lease "B" portions of the units, it is not likely that Peninsula would contend that the payout provisions of farmout "B" should apply to the entire units. Neither should the payout provisions of farmout "A" apply to the entire units. We hold that payout provisions of both farmouts are applicable to the unit wells in proportion to the acreage that each contributed to the units.

*Id.*

Thus, the supreme court determined that, even though the legal consequence of pooling the "A" and "B" leases was that the acreage of the entire unit was considered part of each lease separately, that did not mean that provisions contained in the conveyance documents governing the individual tracts applied universally to the entire unit. Here, that means that the legal consequence of pooling was that "the entire acreage" constituting the pooled unit should be treated as if it were included in Hooks' tract. It was *not* a legal consequence of pooling that all of the individual protections—including the offset obligation provisions designed to protect Hooks' tract from drainage—applied to the entire unit.

Because, as a matter of law, we conclude that the drilling of wells within 1,320 feet of the pooling unit did not trigger the offset obligations in Hooks' Hardin County Leases, we conclude that denial of Hooks' motion for summary judgment was proper. *See* TEX. R. CIV. P. 166a(c); *Wolf*, 44 S.W.3d at 566.

We overrule Hooks' cross-issue on appeal.

## Conclusion

We conclude that the evidence is insufficient to support the trial court's award of $20,081,638.07 for fraud damages, but the evidence is sufficient to support an award of $17,461,162.57 for fraud damages. We suggest a remittitur of $2,620,475.50. If Hooks files in this Court such remittitur within twenty days after the issuance of our opinion, we will modify the trial court's judgment to delete $766,626.85 in "unpooling" damages; delete $2,620,475.50 remitted in fraud damages representing the formation production damages and their associated late charges; modify the amount of most-favored-nations damages to $431,450.71, consistent with the parties' stipulation; and modify the post-judgment interest rate to reflect an 18% rate for past due royalties (i.e., the most-favored-nations damages) and a 5% interest rate for other recoveries and affirm as modified. If the remittitur is not timely filed, then we will let stand our current judgment reversing the trial court's judgment and remanding the cause for a new trial.


                                        Evelyn V. Keyes
                                        Justice

Panel consists of Justices Keyes, Massengale, and Lloyd.